T.C. Memo. 2000-159


UNITED STATES TAX COURT


DURHAM FARMS #1, J.V., GARY L. BLACKBURN, TAX MATTERS PARTNER ET AL.,[1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent

---

[1]Cases of the following petitioners are consolidated herewith:  Durham Farms #1, J.V., Gary L. Blackburn, Tax Matters Partner, docket No. 2468-94; W.J. Hoyt Sons Management Company, Gary L. Blackburn, Tax Matters Partner, docket No. 5104-94; W.J. Hoyt Sons Management Company, Gary L. Blackburn, Tax Matters Partner, docket No. 5105-94; W.J. Hoyt Sons Management Company, Gary L. Blackburn, Tax Matters Partner, docket No. 5106-94; Durham Genetic Engineering 1984-3, J.V., Gary L. Blackburn, Tax Matters Partner, docket No. 9271-94; Shorthorn Genetic Engineering 1984-5, J.V., Gary L. Blackburn, Tax Matters Partner, docket No. 9752-94; Durham Genetic Engineering 1984-3, J.V., Gary L. Blackburn, Tax Matters Partner, docket No. 9768-94; Shorthorn Genetic Engineering 1984-5, J.V., Gary L. Blackburn, Tax Matters Partner, docket No. 9814-94; Timeshares Breeding Service 1989-1, J.V., Gary L. Blackburn, Tax Matters Partner, docket No. 18707-94; W.J. Hoyt Sons Management Company, Gary L. Blackburn, Tax Matters Partner, docket No. 18710-94; Durham Farms #1, J.V., Gary L. Blackburn, Tax Matters Partner, docket No. 20957-94; Shorthorn Genetic Engineering 1982-1, J.V., Gary L. Blackburn, Tax Matters Partner, docket No. 22821-94; Shorthorn Genetic Engineering 1984-5, J.V., Gary L. Blackburn, Tax Matters Partner, docket No. 23429-94; Durham Genetic Engineering 1984-3, J.V., Gary L. Blackburn, Tax Matters Partner, docket No. 23777-94; Durham Farms #1, J.V., Gary L. Blackburn, Tax Matters Partner, docket No. 8175-95; Shorthorn Genetic Engineering 1982-1, J.V., Gary L. Blackburn, Tax Matters Partner, docket No. 10053-95; Shorthorn Genetic Engineering 1984-5, J.V., Gary L. Blackburn, Tax Matters Partner, docket No. 11217-95; Durham Genetic Engineering 1984-3, J.V., Gary L. Blackburn, Tax Matters Partner, docket No. 12500-
(continued...)

Docket Nos.  2465-94,      2468-94,      Filed May 18, 2000.
             5104-94,      5105-94,
             5106-94,      9721-94,
             9752-94,      9768-94,
             9814-94,     18707-94,
            18710-94,     20957-94,
            22821-94,     23429-94,
            23777-94,      8175-95,
            10053-95,     11217-95,
            12500-95,     13236-95,
            14712-95,     20843-95,
            20868-95,     21629-95,
            24241-95,     24643-95.

Michael D. Culy , for petitioners in docket Nos. 5104-94, 5105-94, 5106-94, 18710-94, and 22821-94.

Timothy G. Buck, for petitioners in docket Nos. 5104-94, 5105-94, 22821-94, and 23777-94.

Montgomery W. Cobb, for petitioners in docket Nos. 2465-94, 2468-94, 9721-94, 9752-94, 9768-94, 9814-94, 18707-94, 18710-94, 20957-94, 22821-94, 23429-94, 23777-94, 8175-95, 13236-95, 14712-

---

[1](...continued)
95; Durham Genetic Engineering 1986-2, J.V., Gary L. Blackburn, Tax Matters Partner, docket No. 13236-95; Timeshares Breeding Services 1989-1, J.V., Gary L. Blackburn, Tax Matters Partner, docket No. 14712-95; Durham Farms #1, J.V., Dan C. Johnson, A Partner Other Than the Tax Matters Partner, docket No. 20843-95; Shorthorn Genetic Engineering 1984-5, J.V., Lawrence Dees, A Partner Other Than the Tax Matters Partner, docket No. 20868-95; Shorthorn Genetic Engineering 1982-1, J.V., Gary L. Blackburn, Tax Matters Partner, docket No. 21629-95; Durham Genetic Engineering 1984-3, J.V., Thomas Emerson, A Partner Other Than the Tax Matters Partner, docket No. 24241-95; Timeshares Breeding Services 1990-1, J.V., Edgar Marco, A Partner Other Than the Tax Matters Partner, docket No. 24643-95.  By Order dated Oct. 27, 1999, the Court removed Walter J. Hoyt III, as tax matters partner in each of the consolidated cases.  In that same Oct. 27, 1999, Order, the Court appointed Gary L. Blackburn as successor tax matters partner of each partnership in the cases and also permitted him to be intervening tax matters partner in those cases commenced by a partner other than a partnership's tax matters partner.

95, 20843-95, 20868-95, 21629-95, 24241-95, and 24643-95.

Walter J. Hoyt III, pro se in docket Nos. 10053-95, 11217-95, and 12500-95.[2]

Walter J. Hoyt III (participant), pro se in docket Nos. 20843-95, 20868-95, 24241-95, and 24643-95.[3]

Gerald W. Douglas, Ann M. Murphy, Wesley F. McNamara, Paul Robeck, Kathy I. Shaw, Catherine Caballero, and Ralph W. Jones, for respondent.


# MEMORANDUM FINDINGS OF FACT AND OPINION

DAWSON, Judge:  These cases were assigned to Special Trial Judge Stanley J. Goldberg, pursuant to Rules 180, 181, and 183. All Rule references are to the Tax Court Rules of Practice and Procedure.  Section references are to the Internal Revenue Code in effect for the years in issue.  The Court agrees with and adopts the opinion of the Special Trial Judge, which is set forth below.

## OPINION OF THE SPECIAL TRIAL JUDGE

GOLDBERG, Special Trial Judge:  Respondent issued a notice of final partnership administrative adjustment (FPAA) to each partnership involved in these consolidated cases determining the adjustments in the amounts and for the taxable years as set forth

---

[2]After the trial was held and the parties filed their posttrial briefs, Walter J. Hoyt III was allowed by the Court to withdraw as tax matters partner from these cases.

[3]See supra note 2.

in appendix A hereto.[4]

After concessions, the primary issues for decision are: (1) Whether each of seven of the eight partnerships in the instant cases--Durham Farms #1, J.V., Gary L. Blackburn, Tax Matters Partner (DF #1), Shorthorn Genetic Engineering 1982-1, J.V., Gary L. Blackburn, Tax Matters Partner (SGE 82-1), Durham Genetic Engineering 1984-3, J.V., Gary L. Blackburn, Tax Matters Partner (DGE 84-3), Shorthorn Genetic Engineering 1984-5, J.V., Gary L. Blackburn, Tax Matters Partner (SGE 84-5), Durham Genetic Engineering 1986-2, J.V., Gary L. Blackburn, Tax Matters Partner (DGE 86-2), Timeshares Breeding Services 1989-1, J.V., Gary L. Blackburn, Tax Matters Partner (TBS 89-1), and Timeshares Breeding Services 1990-1, J.V., Gary L. Blackburn, Tax Matters Partner (TBS 90-1)--purchased and acquired ownership of breeding cattle that are subject to an allowance for depreciation under

---

[4]The years in issue for Durham Farms #1 are 1987, 1988, and its years ended Sept. 30, 1989 through 1992. The years in issue for Shorthorn Genetic Engineering 1982-1 are its years ended Sept. 30, 1990 through 1992. The years in issue for Shorthorn Genetic Engineering 1984-5 are 1987, 1988, and its years ended Sept. 30, 1989 through 1992. The years in issue for Durham Genetic Engineering 1984-3 are 1987, 1988, and its years ended Sept. 30, 1989 through 1992. The year in issue for Durham Genetic Engineering 1986-2 is 1991. The years in issue for Timeshares Breeding Services 1989-1 are 1989 and 1991. The year in issue for Timeshares Breeding Services 1990-1 is 1992. The years in issue for W.J. Hoyt Sons Management Co. are its years ended Sept. 30, 1987 through 1990. Respondent granted DF #1, SGE 82-1, SGE 84-5, and DGE 84-3, each permission to change to a taxable year ended Sept. 30, beginning with that partnership's year ended Sept. 30, 1989.

section 167 for the years in issue; (2) whether those seven cattle-breeding partnerships each have substantiated and are entitled to their claimed depreciation deductions with respect to their breeding cattle for the years in issue; (3) whether those seven cattle-breeding partnerships are entitled to certain interest deductions with respect to the promissory note each partnership issued in connection with the purported acquisition of its breeding cattle; (4) whether any of those seven cattle-breeding partnerships is entitled to farm, guaranteed payment, and certain other deductions it claimed; (5) whether DGE 84-3 and SGE 84-5 are entitled to an investment credit for 1987; (6) whether some of those seven cattle-breeding partnerships had certain additional farm income for some of the years in issue; (7) whether the eighth partnership, W.J. Hoyt Sons Management Co., Gary L. Blackburn, Tax Matters Partner (Management), is entitled to certain credits and deductions it claimed for the years in issue; and (8) whether Management had certain additional farm and other income for the years in issue.

### FINDINGS OF FACT

Some of the facts and certain documents have been stipulated for trial pursuant to Rule 91 and are found accordingly. The Court incorporates the parties' stipulations in this opinion by reference.

At the times their respective petitions herein were filed,

DF #1, SGE 82-1, DGE 84-3, SGE 84-5, DGE 86-2, TBS 89-1, TBS 90-1, and Management each maintained its principal place of business in Burns, Oregon.

A.  Overview

Walter J. Hoyt III (Jay Hoyt) is a general partner of each of the seven cattle-breeding partnerships that are involved in the instant cases.  These seven cattle-breeding partnerships were formed and began operating in the years indicated as follows:

| Partnership | Year |
|-------------|------|
| DF #1       | 1973 |
| SGE 82-1    | 1982 |
| DGE 84-3    | 1984 |
| SGE 84-5    | 1984 |
| DGE 86-2    | 1990 |
| TBS 89-1    | 1989 |
| TBS 90-1    | 1990 |

DF #1, SGE 82-1, DGE 84-3, and SGE 84-5 had each been formed as a California or Nevada limited partnership.

Jay Hoyt's father was a prominent breeder of Shorthorn cattle, one of the three major breeds of cattle in the United States.  In order to expand his business and attract investors, the father had started organizing and promoting cattle-breeding partnerships by the late 1960's.  Before and after the father's death in early 1972, Jay Hoyt and other members of the Hoyt family were extensively involved in organizing and operating cattle-breeding partnerships.  From about 1971 through 1992, Jay Hoyt organized, promoted to numerous investors, and operated as a

general partner a total of almost 100 cattle-breeding partnerships.

Several of these earlier cattle-breeding partnerships, including DF #1, were the subject of this Court's opinion in Bales v. Commissioner, T.C. Memo. 1989-568, wherein the years in issue generally were 1977, 1978, and 1979. The Hoyt family originally through W.J. Hoyt & Sons had sold breeding cows or heifers to these earlier partnerships for no money down and a promissory note. In general, the promissory note required a partnership to pay the stated purchase price for its cattle over a specified long-term period of 10 years or more. For about the first 5 years, no principal payments were required from the partnership but only annual interest payments at a specified interest rate per annum. Over the remaining years, the partnership was to pay the note's full principal amount in equal annual installments. W.J. Hoyt & Sons was further granted a security interest in the partnership's breeding cattle, securing payment on the partnership's promissory note. W.J. Hoyt & Sons and the partnership concurrently also entered into a management agreement, pursuant to which W.J. Hoyt & Sons obligated itself to undertake all management with respect to a partnership's breeding cattle, pay all expenses, and provide stud bull services, in exchange for receiving all calves produced and any culled cows (the sharecrop agreement). The sharecrop agreement further

obligated W.J. Hoyt & Sons to replace any partnership breeding cow that could no longer serve as a breeding cow with another cow of a specified quality.  In addition, W.J. Hoyt & Sons further guaranteed that there would be a 10-percent annual increase in the size of the partnership's breeding herd.

Most of the cattle sold to these earlier partnerships were represented to be registered Shorthorn heifers on the bills of sale issued to the partnership.  Others were appendix registered and/or crossbred.  Some were "grade" heifers.  All of the cattle owned by the partnerships registered with the American Shorthorn Association (ASA) were registered under the W.J. Hoyt & Sons name, and not under a partnership's name.  However, other of the Shorthorn cattle sold to the partnerships were not registered with the ASA.  Instead, these cattle were issued certificates by the Hoyt family (Hoyt certificates).

As indicated previously, the Hoyt family through W.J. Hoyt & Sons originally had (1) sold the breeding cattle to earlier cattle-breeding partnerships they formed and promoted to investors and (2) managed those partnerships' breeding cattle pursuant to a sharecrop agreement with each partnership.  These arrangements somewhat changed over the years, in that the Hoyt family conducted these activities through various entities.[5]  At

_____

[5]In Bales v. Commissioner, T.C. Memo. 1989-568 (wherein the years in issue generally were 1977 through 1979), this Court,
(continued...)

some point before the years in issue, Jay Hoyt  decided that when

the Hoyt family sold breeding cattle to a cattle-breeding

partnership, he should not be negotiating as general partner of

that cattle-breeding partnership its purchase of those same

cattle and then managing that partnership's cattle under a

sharecrop agreement between the partnership and W.J. Hoyt & Sons.

However, despite these different entities the Hoyt family

employed, Jay Hoyt continued to head the Hoyt organization and

was ultimately in charge of all of the Hoyt organization's

operations.  All of the individuals managing various entities in

---

⁵(...continued)
among other things, determined with respect to the transactions
of several earlier cattle partnerships (which the Hoyt family
organized and operated, including DF #1) that (1) those
partnerships had acquired the benefits and burdens of ownership
with respect to specific breeding cattle and (2) the promissory
notes they issued were valid recourse indebtedness.  In addition,
Jay Hoyt (as tax matters partner) and respondent later concluded
settlements with respect to the years 1980 through 1986 of those
partnerships and a number of other cattle-breeding partnerships
the Hoyt family organized (including settlements for 1980 through
1986 for some of the seven cattle-breeding partnerships involved
in the instant cases).  In the instant cases, which involve the
years 1987 through 1992 and concern transactions the seven
cattle-breeding partnerships in issue entered into after those in
Bales, however, the parties disagree whether these seven cattle-
breeding partnerships obtained actual ownership of specific
breeding cattle and whether the promissory notes the partnerships
issued were valid indebtedness.  The terms "sale", "sold",
"purchase", "partnership's cattle", and similar terms, insofar as
relating to subsequent transactions now in issue, are used herein
for convenience and are not intended as ultimate findings or
conclusions concerning the partnerships' acquisition of cattle.
Similarly, the use herein of such terms indicating that interest
or principal payments were due should not be construed as our
conveying any legal conclusion concerning the validity of the
partnerships' promissory notes.

the Hoyt organization answered to him.

At some point, W.J. Hoyt Sons Ranches (Ranches) (which originally in the 1960's had been an oral partnership of Jay Hoyt, his two brothers Ric Hoyt and Seth Hoyt, and their father) was reformed and became the seller of the cattle to the cattle-breeding partnerships that Jay Hoyt and the Hoyt family organized and operated. After it was reformed, Ranches' partners included Betty Hoyt (Jay Hoyt's wife), Ric Hoyt, and Steve Hoyt (another of Jay Hoyt's brothers). Ranches operated until about the late 1980's, as the process of its liquidation was begun around 1987 or 1988. During Ranches' liquidation, some of Ranches' former operations continued to be carried out by Ranches Trust. After Ranches was liquidated, around 1992 W.J. Hoyt Sons Ranches MLP became the seller of more cattle to certain of the cattle-breeding partnerships. The promissory notes many of the cattle-breeding partnerships previously had issued to Ranches were transferred to W.J. Hoyt Sons Ranches MLP.

In addition, during 1976, Management (a Nevada limited partnership that is one of the eight partnerships involved in the instant cases) was formed to manage all of the cattle collectively owned by a group of 17 cattle-breeding partnerships that the Hoyt family had previously organized. Jay Hoyt was Management's general partner, and its other limited partners included the cattle-breeding partnerships whose cattle Management

managed.  Other cattle-breeding partnerships that Jay Hoyt organized after 1976 also became partners in Management.  Each cattle-breeding partnership and Management generally entered into a sharecrop agreement similar to those previously entered into by various cattle-breeding partnerships and W.J. Hoyt & Sons.

The Feedlot Co. partnership was composed of certain Hoyt family members and Management.  Among other things, the Feedlot Co. partnership was formed to obtain a line of credit from a commercial lender to finance purchases of feed for the cattle the Hoyt organization managed.

Timeshares Breeding Services is another operation that was started by the Hoyt organization around the mid-1980's.  It arranged leases of bulls ostensibly owned by the Timeshares cattle-breeding partnerships the Hoyt family had organized and promoted to numerous investors.  Unlike the earlier cattle-breeding partnerships, which typically owned breeding cows or heifers, the Timeshares partnerships owned breeding bulls.  These breeding bulls typically would be leased to owners of commercial-grade cattle herds under the borrow-a-bull program Timeshares Breeding Services conducted.

B.  Changes in the Hoyt Organization's Cattle Management and Record-Keeping Practices

By at least the early 1980's, the Hoyt organization's cattle management and record keeping practices changed dramatically. These changed management and record-keeping practices continued

during the period from 1987 through 1992. The record in the instant cases reflects that many of the documents, records, and tax returns the Hoyt organization prepared relating to its transactions with the cattle-breeding partnerships it formed are inaccurate and unreliable.

For instance, the cattle-breeding partnerships the Hoyt organization formed in 1983, 1984, 1985, and 1986 had no specific breeding cattle assigned to them even as of 1987.[6] This is reflected in a report the Hoyt organization prepared with respect to the 1986 operating results of cattle-breeding partnerships it had formed. This report, dated December 31, 1986, states that no operating results were reported on cattle-breeding partnerships formed in 1983, 1984, 1985, and 1986 because those partnerships were still "in the process of forming their breeding herds * * * [in a selection process] which

_____

[6]Each of the breeding cattle a partnership acquired was supposed to be listed and identified in the bill of sale Ranches issued that partnership. According to Jay Hoyt, the Hoyt organization's original practice had been to attach copies of all the animals' registration certificates to the bill of sale. He further indicated that after the Hoyt organization's cattle records were computerized around 1985, a Schedule A containing all of this same information (including each individual animal's tag number, registration number, birth date, and sex, as well as the respective registration numbers of its sire and dam) was instead prepared and attached to the bill of sale. In addition, although the sharecrop agreement that Management and a cattle-breeding partnership entered typically recognized that any registration papers on a partnership's breeding cattle would be taken out in the Hoyt family's name, the sharecrop agreement required Management to know the identity and number of a partnership's breeding cattle at all times.

requires approximately 4 years to complete." It further states that those partnerships' operating results would be reported annually only when "their investment period is completed." Similar statements are also made in an earlier 1984 Annual Report Of Operating Results Of Cattle Breeding Partnerships that the Hoyt organization prepared. That report states that "No partnership results have been shown for any partnerships formed in 1983 and 1984. They, like the 1982 partnerships, are still in the process of forming their breeding herd through a selection process requiring, approximately 3 years."

Notwithstanding the Hoyt organization's failure to provide requisite numbers of specific breeding cattle to them, many of these partnerships formed in 1982, 1983, 1984, 1985, and 1986 filed tax returns for those years claiming deductions with respect to their "breeding cattle herds".[7] In addition, to support the deductions the partnerships claimed, the Hoyt organization issued bills of sale, annual herd recap sheets, and

---

[7]The Hoyt organization prepared the tax returns for the cattle-breeding partnerships it formed and operated. Jay Hoyt as the managing general partner of a partnership typically signed and filed that partnership's return. For example, the depreciation schedule included in DGE 84-3's 1988 return reflects that it had "acquired" breeding herds for $4,759,500 on Feb. 1, 1984, and for $359,000 on Feb. 1, 1986, each of which it had been depreciating over 5 years. Similarly, the depreciation schedule included in SGE 84-5's 1987 return reflects that it had "acquired" breeding herds for $4,826,000 on Apr. 1, 1984, and for $350,000 on Feb. 1, 1986, each of which it had been depreciating over 5 years.

other documents purporting to evidence that sales of large numbers of specific cattle had been made to these partnerships in those years.[8]

During the litigation in Bales v. Commissioner, T.C. Memo. 1989-568, the Hoyt organization scheduled the "herds" of some of the earlier partnerships the Hoyt family had formed (including those "herds" of Florin Farms #3 (FF #3) and Florin Farms #4 (FF #4)) to be liquidated during 1984 and 1985.  In a memorandum dated October 31, 1984, to his brother Ric Hoyt and other of the Hoyt organization's cattle managers, Jay Hoyt instructed them that any cows they sold at certain public cattle sales during 1984 and 1985 would be attributed to specified partnerships, like FF #3 and FF #4, to be liquidated.  The memorandum also stated that immediately before record ownership of such cows was transferred to their buyers, "ownership" of the cows would be assigned to FF #3 and FF #4.  According to the memorandum, those other partnerships "giving up" "their cows" to FF #3 and FF #4

_____

[8]For example, in evidence are two bills of sale both dated Apr. 1, 1984, that the Hoyt organization issued to SGE 84-5.  One bill of sale reflects SGE 84-5 to have acquired 500 breeding cows with calves at side on that date for a stated price of $5,080,000.  The other bill of sale reflects SGE 84-5 to have acquired 269 head of breeding cows on that date for a stated price of $5,080,000.  Also in evidence is a 1984 herd recap sheet for SGE 84-5 that reflects the partnership to have purchased 693 breeding cattle during 1984.

were to receive back "other cows".[9]

The numbers of cattle owned by the cattle-breeding partnerships reflected in Management's financial statements for its fiscal years ended September 30, 1989 and 1990, were not based upon cattle Management was actually managing. Jay Hoyt had assigned the preparation of Management's 1989 and 1990 fiscal year financial statements to another individual working in the Hoyt organization. From about the fall of 1989 through early 1991, this worker performed this and other related work with respect to the fiscal year 1989 and 1990 financial statements. In a memorandum dated October 24, 1989, to Jay Hoyt, the worker (1) noted that in Management's financial statements for prior years the numbers of cattle reflected in the original bills of sale the Hoyt organization had issued each cattle partnership were used as the cattle counted in each partnership's breeding

---

[9]In the Oct. 31, 1984, memorandum, Jay Hoyt claimed that these "cattle exchange transactions" between other partnerships and FF #3 and FF #4 would be "tax free exchanges". He further maintained that the rationale for the "exchanges" was that the other partnerships would be "receiving" a more mature, "proven cow" from FF #3 or FF #4, in return for their "giving up" an unproven, "glamor girl cow". In fact, the 1984 and 1985 "dispersal sale cattle prices" that FF #3 and FF #4 "realized" were later offered in evidence by the taxpayers in the Bales v. Commissioner, T.C. Memo. 1989-568. This valuation evidence ultimately was relied heavily upon by this Court in reaching its conclusion that the stated sales prices the Bales cattle-breeding partnerships had earlier agreed to pay the Hoyt family for their breeding cattle were within a reasonable range of those cattle's fair market value. See id. In further point of fact, as discussed infra, FF #3 and FF #4 were not liquidated and never received these "dispersal sale proceeds".

herd and (2) asked whether the worker should adjust those cattle numbers to allow for the 10-percent annual herd increase required in the sharecrop agreements between the partnerships and Management. In his written response to the October 24, 1989, memorandum, Jay Hoyt told the worker not to make allowances in the cattle numbers for the 10-percent annual herd increase requirement. In a later memorandum dated December 31, 1990, to Jay Hoyt, the worker stated that it was impossible to reconcile Management's financial statements with the tax returns the Hoyt organization had prepared. The worker added that Jay Hoyt was right in previously stating Management's financial statements to be a "mess". In another memorandum to Jay Hoyt dated January 7, 1991, the worker raised certain questions with him concerning the billing of cattle boarding expenses for the 1990 fiscal year to the cattle-breeding partnerships. Among other things, the worker questioned why Florin Farms #1 (FF #1), FF #3, and FF #4 were to be billed for such expenses, as the worker thought those partnerships had been liquidated and had no cattle. See supra note 9. In his written reply to the worker, Jay Hoyt stated that the money to have been distributed to FF #1, FF #3, and FF #4, had instead been used by him to pay attorney's fees. He further stated that all of the cattle collectively owned by the first 17 cattle-breeding partnerships the Hoyt family had organized had been reallocated among each of those 17 partnerships during 1990,

and that now each partnership had cattle again.

In a memorandum dated February 4, 1991, issued to various workers in the Hoyt organization, Jay Hoyt instructed them to register with the ASA a calf for each cow that had been bred, not just the "live calves".[10]  According to Jay Hoyt, this was necessary in order to qualify for a lower registration fee rate of $6 per animal.[11]

In his memorandum dated October 1, 1993, to the Hoyt organization's cattle managers, Jay Hoyt instructed them to prepare herd recap sheets for the cattle-breeding partnerships up through December 31, 1992.  He further advised them that, using some of Management's other cattle record information, they were to "fill in" Management's cattle records by recording specific cattle as belonging to a particular partnership.  He commented that all of the cattle a partnership was assigned must have

_____

[10]The ASA generally did not inspect or otherwise verify the existence of the Shorthorn cattle registered with it, because it generally accepted to be true the information concerning the animal provided in the registration application a breeder submitted.  However, where an animal being registered was produced through artificial insemination techniques, such as embryo transplanting, the ASA's rules required that the animal's asserted parentage be established through a blood test.

[11]At about this time, the Hoyt organization proposed to Roger Hunsley (Mr. Hunsley) (who had been the ASA's executive director since about 1983 and an expert witness for the taxpayers in Bales v. Commissioner, supra,) that it be allowed to register calves for a lower registration fee of $6 per animal, in return for its promising to register a minimum of 4,000 calves annually for 1991 and 1992.  Mr. Hunsley accepted this proposal.

something in common that would make those cattle different from cattle assigned to other partnerships. He then suggested possible groupings the managers might use in assigning cattle among the partnerships, including common sires, common grandsires, common cow families, just bulls, just females, ASA appendix registry cattle, full blood cattle, etc.

C. Transactional Documentation Relating to the Seven Cattle-Breeding Partnerships' Purchases of Cattle From 1987 Through 1992

The record contains almost no transactional documentation relating to DF #1's, SGE 82-1's, DGE 84-3's, SGE 84-5's, DGE 86-2's, TBS 89-1's, and TBS 90-1's purchases of breeding cattle during 1987 through 1992. Unlike Bales v. Commissioner, T.C. Memo. 1989-568,[12] among other things, there is no (1) bill of sale issued by Ranches or its successors to each of the seven cattle-breeding partnerships listing and identifying the individual breeding cattle sold to each partnership, (2) ?Full Recourse Promissory Note" issued by each partnership for its cattle, and (3) sharecrop agreement between Management and each partnership. The record contains documentation relating only to transactions some of these seven partnerships entered into before 1987. The record also includes certain annual herd recap sheets the Hoyt organization issued concerning the breeding cattle of

---

[12]See also River City Ranches #4, J.V. v. Commissioner, T.C. Memo. 1999-209 (involving similar sheep-breeding partnerships Jay Hoyt organized and operated).

each partnership.  These herd recap sheets are discussed more fully infra.

D.  Some Investors' Failure To Make Payments

During the period from 1987 through 1992, a large number of investors in the cattle-breeding partnerships the Hoyt organization had formed (including some investors in certain of the seven cattle-breeding partnerships in the instant cases) failed to continue making the specified payments required of them, including paying their pro rata share of the payments required under their partnership's "Full Recourse Promissory Note".  The Hoyt organization never sought to enforce and hold any of the defaulting investors personally liable for the payments they had defaulted upon.  These investors were allowed to walk away from their partnership's "Full Recourse Promissory Note".

E.  DF #1's, SGE 82-1's, DGE 84-3's, SGE 84-5's, DGE 86-2's, TBS 89-1's, and TBS 90-1's Respective Returns for the Years in Issue

DF #1's returns for some of the years in issue reflect that it originally claimed depreciation on a "breeding herd" placed in service in 1990, for which its cost or other basis was $1,123,972.  DF #1 depreciated this breeding herd over 5 years.

SGE 82-1's returns for some of the years in issue reflect that it originally claimed depreciation on a "breeding herd" placed in service in 1990, for which its cost or other basis was $1,923,810.  SGE 82-1 depreciated this breeding herd over 12

years.

DGE 84-3's returns for some of the years in issue reflect that it originally claimed depreciation on a "breeding herd" it placed in service on February 1, 1984, for which its cost or other basis was $4,759,500, and on a "breeding herd" it placed in service on February 1, 1986, for which its cost or other basis was $359,000. DGE 84-3 depreciated each breeding herd over 5 years.

SGE 84-5's returns for some of the years in issue reflect that it original claimed depreciation on a "breeding herd" it placed in service on April 1, 1984, for which its cost or other basis was $4,826,000, and on a "breeding herd" it placed in service on February 1, 1986, for which its cost or other basis was $350,000. SGE 84-5 depreciated each breeding herd over 5 years.

DGE 86-2's returns for 1991 reflect that it originally claimed depreciation on a "breeding herd" placed in service in 1991, for which its cost or other basis was $4,312,237. DGE 86-2 depreciated this breeding herd over 5 years.

TBS 89-1's returns for 1989 and 1991 reflect that it originally claimed depreciation on a "breeding herd" placed in service on March 1, 1989, for which its cost or other basis was $5,250,000, and on a "breeding herd" placed in service on January 1, 1991, for which its cost or other basis was $2,775,994. TBS

89-1 depreciated each breeding herd over 5 years.

TBS 90-1's return for 1992 reflects that it originally claimed a $2,174,204 depreciation deduction on a "bull breeding".

F. Respondent's Examinations of the Returns of Many Cattle-Breeding Partnerships and Certain Entities in the Hoyt Organization; the FPAA's Issued in the Instant Cases; and Petitioners' Respective Petitions

Respondent commenced examinations of returns for the years 1987 through 1992 that had been filed by (1) numerous cattle-breeding partnerships the Hoyt organization had formed (including DF #1, SGE 82-1, DGE 84-3, SGE 84-5, DGE 86-2, TBS 89-1, and TBS 90-1) and (2) certain Hoyt organization entities (including Management). During these examinations, respondent asked the cattle-breeding partnerships and their representatives, among other things, to substantiate the depreciation and other deductions claimed on those partnerships' returns.

During the examinations conducted, respondent noted a number of inconsistencies between the deductions claimed on the cattle-breeding partnerships' returns and various documents the partnerships and their representatives provided. In addition, respondent received bills of sale for some 26 newly formed partnerships (where the 1987 return for each partnership was the first return that partnership had filed) that reflected those partnerships to have collectively purchased over 13,000 breeding cattle during 1987. Only the bills of sale for 21 of the 26 newly formed partnerships had a Schedule A listing and

identifying the individual animals a partnership had allegedly purchased.  The bills of sales for these 21 partnerships reflected them to have collectively purchased more than 10,000 breeding cattle during 1987.  Similarly, certain 1991 herd recap sheets respondent received reflected 18 partnerships, including DGE 86-2, as each purchasing 500 to 600 breeding cows during 1991.  For instance, the 1991 herd recap sheet for DGE 86-2 reflects the partnership to have purchased 545 breeding cows during 1991.[13]

During the examination, respondent issued numerous administrative summonses to the cattle-breeding partnerships and certain entities in the Hoyt organization, pursuant to which respondent sought information and documents relating to the cattle breeding partnerships' alleged cattle purchases from the Hoyt organization.  Among other things, respondent sought to inspect and count the breeding cattle allegedly purchased and owned by the cattle-breeding partnerships.  The Hoyt organization

---

[13]As indicated previously, the record contains no bills of sale relating to DF #1's, SGE 82-1's, DGE 84-3's, SGE 84-5's, DGE 86-2's, TBS 89-1's, and TBS 90-1's purchases of breeding cattle during 1987 through 1992.  Indeed, the revenue agent who examined the returns covering the period from 1987 through 1992 of all the cattle-breeding partnerships the Hoyt organization had formed (including the returns of the seven partnerships involved in the instant cases) testified that no bills of sale were provided to respondent for any breeding cattle purchases any of the partnerships allegedly made from 1988 through 1991.  Yet, in his testimony, Jay Hoyt claimed that all of the bills of sale relating to the partnerships' alleged breeding cattle purchases from 1988 through 1992 had been provided to respondent.

initially failed to provide much of this information, resulting in respondent's commencing a summons enforcement proceeding in the U.S. District Court for the District of Oregon. On July 17, 1992, the District Court ordered Jay Hoyt to provide certain information and allow respondent to inspect and count the "Hoyt cattle" (which was defined to be the various cattle owned, maintained, or under the custody or control of any of the 92 partnerships that were the subject of the summons enforcement proceeding). To comply with this July 17, 1992, Order, respondent and Jay Hoyt executed an October 30, 1992, memorandum of understanding concerning the cattle count to be conducted by respondent's expert Ron Daily (Mr. Daily). In his signed statement also dated October 30, 1992, Jay Hoyt further provided information as to 11 specified locations at which the "commingled Hoyt cattle herd" was kept. Among other things, Jay Hoyt, in this signed statement, represented there to be an estimated 16,075 to 16,775 cattle (including some calves that might later be born) at the 11 locations. He further stated these 11 locations to be all of the locations for the Hoyt herd cattle as of October 28, 1992.

In the cattle count he performed from fall 1992 through spring 1993, Mr. Daily determined there were a total of 7,993 cattle. Of the 7,993 total cattle he counted, 4,764 were mature breeding cattle. At every location that he visited and counted

cattle, Mr. Daily asked the ranch manager to sign a statement agreeing or disagreeing with the numbers of cattle Mr. Daily determined were present. With just a few exceptions, all of the ranch managers at each location agreed with Mr. Daily's cattle numbers. During the cattle count he conducted, Mr. Daily further had asked Jay Hoyt to disclose whether there were any additional locations where other cattle might be located. However, in his witness statement submitted to the District Court on or about January 23, 1993, Jay Hoyt maintained that the specific locations for the cattle had been provided to respondent and indicated that he saw no reason why the cattle count could not go on.

In the respective FPAA's issued to DF #1, SGE 82-1, DGE 84-3, SGE 84-5, DGE 86-2, TBS 89-1, and TBS 90-1, respondent, among other things, determined that the partnerships had failed to substantiate many of their claimed deductions. For instance, with respect to the depreciation deduction DF #1 claimed on its breeding cattle for its year ended September 30, 1991, the FPAA issued to DF #1 for that year states, in pertinent part:

> It has been determined that * * * [DF #1] is not entitled to the depreciation deduction claimed on its Schedule F because the partnership has not established: (1) That it possessed depreciable assets which it used for the production of income or in carrying on a trade or business; (2) the accumulated depreciation and depreciable basis of its assets; and (3) the relevant date and proper computation method.

In the FPAA's issued to Management for its years ended September 30, 1987 through 1990, respondent, among other things,

determined that Management had failed to report tens of millions of dollars of income from (1) cattle purportedly transferred to it by numerous cattle-breeding partnerships as management fees under the sharecrop agreements between them and Management and (2) large numbers of those same cattle Management then purportedly transferred to Ranches in payment for feed, management, consulting, freight services, and other goods and services provided by Ranches.

DF #1, SGE 82-1, DGE 84-3, SGE 84-5, DGE 86-2, TBS 89-1, TBS 90-1, and Management filed respective petitions seeking review of the FPAA's that had been issued to them. In their respective petitions or amended petitions, these partnerships have modified the depreciation and other deductions being claimed by them for the years in issue. The total depreciation, other deductions, and other adjustments now in issue are given infra in appendix B to this Memorandum Opinion.

## OPINION

Petitioners bear the burden of proving that respondent's determinations in the FPAA's are incorrect. See Rules 142(a), 240(a); Welch v. Helvering, 290 U.S. 111 (1933). Particularly, where respondent, as in the instant cases, has disallowed depreciation and other deductions claimed by a partnership, it is incumbent on petitioners to substantiate and establish the partnership's entitlement to those deductions under the terms of

the applicable statutes permitting those deductions.  See <u>New Colonial Ice Co. v. Helvering</u>, 292 U.S. 435 (1934); <u>Karme v. Commissioner</u>, 673 F.2d 1062, 1065 (9th Cir. 1982), affg. 73 T.C. 1163 (1980).

<u>Issue 1.  Depreciation Deductions Claimed by the Seven Cattle-Breeding Partnerships in the Instant Cases</u>

Section 167 generally allows as a depreciation deduction a reasonable allowance for exhaustion and wear and tear of property used in business or of property held for the production of income.  The person who bears the economic loss of invested capital resulting from the exhaustion and wear and tear of business property or property held for the production of income is the one entitled to the depreciation deduction.  See <u>Helvering v. F. & R. Lazarus & Co.</u>, 308 U.S. 252, 254 (1939).

In the instant cases, petitioners and respondent recognize that for DF #1, SGE 82-1, DGE 84-3, SGE 84-5, DGE 86-2, TBS 89-1, and TBS 90-1 to be entitled to their claimed depreciation and other deductions, each partnership must be the owner for tax purposes of the specific numbers of breeding cattle that it allegedly purchased and placed in service during the years in issue.  Respondent raises no contention that each partnership was in an activity not engaged in for profit.  Although respondent has not asserted that each partnership's transaction was a sham, the parties disagree to some extent with respect to the transactions' economic substance.  They disagree over whether

each partnership's stated purchase price approximated the then fair market value of the cattle. They also disagree over whether the purportedly recourse long-term notes the partnerships issued were valid indebtedness.

For a sale to have occurred for tax purposes, the benefits and burdens of ownership must be transferred. See Grodt & McKay Realty, Inc. v. Commissioner, 77 T.C. 1221, 1237-1238 (1981). This test is a practical one, and there are no hard and fast rules. Instead, the transaction must be viewed as a whole, in light of realism and practicality. See Commissioner v. Segall, 114 F.2d 706, 709-710 (6th Cir. 1940), revg. on other grounds 38 B.T.A. 43 (1938); Harmston v. Commissioner, 61 T.C. 216, 228-229 (1973), affd. 528 F.2d 55 (9th Cir. 1976). Some of the factors to be considered are: (1) Whether legal title passes; (2) how the parties treat the transaction; (3) whether an equity in the property was acquired; (4) whether the contract creates a present obligation on the purchaser to make payments; (5) whether the right of possession is vested in the purchaser; (6) which party bears the risk of loss or damage to the property; and (7) which party receives the profits from the operation and sale of the property. See Grodt & McKay Realty, Inc. v. Commissioner, supra at 1237-1238; see also Cherin v. Commissioner, 89 T.C. 986, 996-997 (1987).

A.  <u>Whether DF #1, SGE 82-1, DGE 84-3, SGE 84-5, DGE 86-2,</u>
<u>TBS 89-1, and TBS 90-1 Acquired the Benefits and Burdens of</u>
<u>Ownership as to Specific Breeding Cattle</u>

For DF #1, SGE 82-1, DGE 84-3, SGE 84-5, DGE 86-2, TBS 89-1,
and TBS 90-1 to be entitled to their claimed depreciation
deductions, each partnership must establish that it acquired the
benefits and burdens of ownership as to the specific individual
breeding cattle making up its alleged breeding herd.  In that
connection, however, the record discloses petitioners to be in
substantial difficulty in establishing that each partnership
actually acquired anywhere near its stated number of breeding
cattle.  Indeed, the evidence petitioners presented to
substantiate and identify the specific individual breeding cattle
these partnerships "owned" is considerably lacking, exhibits
major shortcomings, and, at times, is directly contradicted by
the Hoyt organization's own internal documents.  Certain of these
internal documents raise serious doubts in the Court's mind as to
whether large numbers of the breeding cattle allegedly sold these
partnerships, in fact, existed.

No registration papers with respect to specific breeding
cattle were obtained in any partnership's name.  Rather, any
registration certificates reflect only the Hoyt family to be the
owner of those registered cattle.[14]

---

[14]Unlike the parties in <u>River City Ranches #4, J.V. v.</u>
<u>Commissioner</u>, T.C. Memo. 1999-209 (a case involving similar
(continued...)

Petitioners further acknowledge that there are some problems regarding the records they have offered in evidence to substantiate the depreciation and other deductions claimed by the partnerships. Petitioners also have indicated that the depreciation deductions to which the partnerships are entitled likely will be less than what the partnerships originally had claimed.

On brief, however, petitioners argue that sufficient breeding cattle existed in each year during the period from 1987 through 1992 to have been purchased by all of the cattle-breeding partnerships the Hoyt organization formed (including by the seven partnerships in the instant cases). Petitioners claim this has been established by (1) the bills of sale and annual herd recap sheets the Hoyt organization issued (which petitioners maintain were accurate and contemporaneous documents)[15] and (2) their

---

[14](...continued)
sheep-breeding partnerships Jay Hoyt formed and operated), the parties in the instant cases did not introduce in evidence detailed information from numerous individual animal registration certificates.

[15]On brief, petitioners further cite the cattle count performed during the litigation of Bales v. Commissioner, T.C. Memo. 1989-568, pursuant to which there were estimated to be 6,500 adult cows in the herds of 29 cattle-breeding partnerships. The Court notes that this previous count was done in 1985. Moreover, not all of the estimated 6,500 cattle were actually examined and counted. Rather, cattle were counted in randomly selected portions of 7 out of 26 fields or pastures. From the 250 to 400 cows counted in what was thought was a representative sampling, a statistician extrapolated that there were a total of
(continued...)

witness Norm Favre's (Mr. Favre) conclusion there were a total of 26,205 cattle in the Hoyt universal herd pursuant to the cattle count he performed from fall 1992 through spring 1993.[16]

---

[15](...continued)
approximately 6,500 adult cows present. It is further to be noted that following 1985, the Hoyt organization claimed that thousands of breeding cattle that it managed on behalf of numerous cattle-breeding partnerships died as a result of drought and disease. In fact, many of the cattle-breeding partnerships claimed deductions on their returns for their alleged large cattle losses from drought and disease. Although petitioners have now conceded the loss deductions for drought and disease originally claimed by the partnerships in the instant cases, the Hoyt organization's prior position was that thousands of breeding cattle were lost during 1987 through 1992 to drought and disease. In addition, the record also contains evidence indicating that, following 1985, the Hoyt organization may have sold off a large number of breeding cattle which had been assigned to the cattle-breeding partnerships. These cattle loss claims, as well as the Hoyt organization's possible sale of breeding cattle previously assigned to the partnerships, are discussed more fully notes 30 and 31. At any rate, the figure of 6,500 cattle estimated in the previous 1985 cattle count is neither conclusive nor unequivocal evidence establishing the numbers of breeding cattle that actually might have been present during the 1987 through 1992 period.

[16]The Hoyt organization hired Mr. Favre to conduct this cattle count. Originally, Mr. Favre was supposed to count the cattle together with respondent's expert Mr. Daily. However, because of disagreements between Mr. Daily and the Hoyt organization concerning (1) the procedures to be used in performing the count and (2) scheduling the counts at various locations, Mr. Favre and Mr. Daily conducted their respective cattle counts separately. It is further to be noted that unlike Mr. Daily (who testified in the instant cases as an expert witness on cattle counting and cattle appraisal), Mr. Favre did not testify as an expert. Rather, Mr. Favre testified as a fact witness, and his cattle count report was entered in evidence as a business record of the Hoyt organization.

B.  The Bills of Sale and Herd Recap Sheets Issued by the Hoyt Organization

As indicated previously, petitioners argue that various bills of sale and annual herd recap sheets the Hoyt organization issued substantiate the depreciation deductions on breeding cattle being claimed for the years in issue in the instant cases by DF #1, SGE 82-1, DGE 84-3, SGE 84-5, DGE 86-2, TBS 89-1, and TBS 90-1.[17]  They maintain that these bills of sale and herd recap sheets are reliable and contemporaneous documents evidencing the alleged specific individual breeding cattle each partnership purportedly purchased and owned from 1987 through 1992.  In making this contention, petitioners heavily rely on the testimony of Jay Hoyt.

Jay Hoyt specifically testified that the bills of sale and annual herd recap sheets the Hoyt organization issued to the cattle-breeding partnerships were reliable and contemporaneous documents.  Although he acknowledged occasional but inadvertent

---

[17]In their brief, petitioners contend that the annual herd recap sheets in evidence reflect that, collectively, all of the cattle-breeding partnerships (which in some years may have included perhaps almost 100 separate partnerships) owned the following total numbers of cattle on the dates indicated:

| Date | Total Number of Cattle |
|------|------------------------|
| 1-1-87 | 22,457 |
| 1-1-88 | 25,613 |
| 1-1-89 | 23,418 |
| 1-1-90 | 17,336 |
| 1-1-92 | 22,148 |

accounting and/or clerical errors may have been made in compiling the cattle records the Hoyt organization maintained, he asserted the annual herd recap sheets were at least 95 percent accurate. He explained the process by which the annual herd recap sheets were prepared. According to Jay Hoyt, the Hoyt organization had computerized its cattle records around 1985. During each year, the cow hands and cattle managers maintained notebooks and other papers containing pertinent information on individual cattle they managed (country records). In general, in the fall the cattle would be rounded up and brought to winter pasture. The cattle managers near the end of the year would then submit these country records on all the cattle to other Hoyt organization personnel to have the information entered onto the Hoyt organization's computerized cattle record keeping system. From this information that the cattle managers submitted, a cattle-breeding partnership's herd recap sheet for that year would be prepared. Jay Hoyt related that the herd recap sheets for each year would be prepared by the early part of the following year. He added that once the data from the original country record source documents had been entered, all of the country records were typically destroyed, as it was no longer necessary to maintain those documents because the information on them had been entered into and was contained in the Hoyt organization's computerized records.

The Court finds substantial portions of Jay Hoyt's testimony evasive and less than forthright. His claims regarding the contemporaneous nature and reliability of the bills of sale and herd recap sheets are directly contradicted by substantial other convincing evidence in the record. The Court considers highly suspect the herd recap sheets and other documents the Hoyt organization prepared during the period from 1987 through 1992. Indeed, as the Court indicated supra, by the early 1980's the Hoyt organization's cattle management and record-keeping practices had changed dramatically. As a result, many of the documents, records, and tax returns the Hoyt organization subsequently prepared regarding transactions between itself and the many cattle-breeding partnerships (which it had formed, promoted to numerous investors, and managed) were inaccurate and unreliable.

Contrary to petitioners' and Jay Hoyt's contentions, the Court does not believe that the 1987 through 1992 annual herd recap sheets in evidence are contemporaneous documents. Among other things, if the 1988, 1989, and 1990 herd recap sheets had existed and been available during the fall 1989 through early 1991 period, the Hoyt organization worker preparing Management's financial statements for its fiscal years ended September 30, 1989 and 1990, would then have consulted those herd recap sheets to find out each cattle-breeding partnership's "breeding herd

numbers". Instead, as reflected by the worker's questions to Jay Hoyt and Jay Hoyt's responses (which we have previously noted), a far different process was employed to prepare Management's 1989 and 1990 fiscal year financial statements.[18]

The Court would further note (as was stated supra) that the record includes none of the bills of sale that purportedly were issued to cattle-breeding partnerships from 1988 through 1992, notwithstanding that a number of these partnerships (including several of the seven cattle-breeding partnerships in the instant cases) reported on their tax returns purchasing breeding cattle during this period for which they are claiming deductions. A revenue agent for respondent testified that no bills of sale for any cattle-breeding partnerships were furnished for years after 1987. Yet, Jay Hoyt testified that he provided to respondent such bills of sale for the years from 1988 through 1992.[19]

---

[18]It is further to be noted that following Mr. Favre's completion of his cattle count in about spring 1993 (which count was mentioned supra note 16, and is discussed in more detail infra), Jay Hoyt, in a memorandum dated Oct. 1, 1993, instructed the Hoyt organization's cattle managers to prepare herd recap sheets for the cattle-breeding partnerships up through Dec. 31, 1992. See supra note 17.

[19]We do not find to be credible this and other similar assertions of Jay Hoyt regarding these bills of sale. Respondent had been requesting them from Jay Hoyt, the cattle-breeding partnerships, and the Hoyt organization since at least about 1992 (when respondent actively started examining many of the returns filed by the partnerships and certain Hoyt organizations for the years covering the 1987 through 1992 period). Jay Hoyt testified these alleged 1988 through 1992 bills of sale had been provided
(continued...)

With respect to some of the bills of sale and herd recap sheets issued before 1988 that are in evidence, there are a number of discrepancies and inconsistencies. For instance, two bills of sale both dated April 1, 1984, were issued by the Hoyt organization to SGE 84-5. One bill of sale reflects SGE 84-5 to have acquired 500 breeding cows with calves at side on that date for a stated price of $5,080,000. The other bill of sale reflects SGE 84-5 to have acquired 269 breeding cows on that date for a stated price of $5,080,000. Also, only one of these bills of sale includes a Schedule A listing and describing the specific individual cattle SGE 84-5 acquired. Moreover, the 1984 herd recap sheet for SGE 84-5 reflects it to have acquired 693 breeding cattle during 1984. See supra note 8.

At trial, Jay Hoyt testified that the above two bills of sale covered a single April 1, 1984, transaction in which 769 breeding cows and 500 calves were sold to SGE 84-5 for a total

---

[19](...continued)
by him to respondent. He maintained that respondent had been given access to everything the Hoyt organization had. He also asserted that many of the Hoyt organization's records later became unavailable, because those records had been seized by postal inspectors from the Hoyt organization's offices in June 1995. However, the postal inspector who conducted the seizure testified that shortly after effecting the seizure, he had provided Jay Hoyt with an inventory of the seized documents. This postal inspector also related that, in response to Jay Hoyt's and the Hoyt organization representatives' later requests, he had offered them access to the documents that had been seized. According to the postal inspector, Jay Hoyt had also been provided with copies of all the seized documents.

price of $5,080,000. He further claimed that the Schedule A to one bill of sale (listing and identifying the specific 269 individual breeding cows the partnership purportedly acquired) had been lost. In his testimony, Jay Hoyt further acknowledged SGE 84-5's 1984 herd recap sheet (reflecting the partnership to have purchased 693 breeding cattle during 1984) to be inconsistent with the two April 1, 1984, bills of sale. However, he asserted that Management's practice, in preparing the herd recap sheets for a cattle-breeding partnership's first year of operations, had been to reflect the net number of cattle later on hand at yearend as the number of cattle a cattle-breeding partnership purchased. He further specifically testified that the prospective breeding cows SGE 84-5 was to purchase had been identified in 1983 and that he reviewed a list of the cows in early 1984. He added that between the April 1, 1984, purchase date and December 31, 1984, some of the cows SGE 84-5 had purchased possibly might have been lost, causing those cows not to be reflected in SGE 84-5's 1984 herd recap sheet.

The Hoyt organization's above-asserted "accounting practice" is contrary to standard accounting principles because its herd recap sheets show each partnership's breeding herd to have had no cattle born, no cattle culled, and no deaths or disappearances. It is extremely unlikely that the breeding herd each of these partnerships purportedly acquired would, in fact, have produced

no calves during that partnership's first year of operations. Presumably, an important incident of breeding herd ownership is the right to benefit from any calves produced by that herd. (The sharecrop agreements provided that a partnership would still retain the breeding value certificates (i.e., essentially the rights to any registration papers) on any calves produced by its breeding herd, even though, pursuant to the sharecrop agreement, all calves were to belong to the Hoyt organization entity that managed the partnership's breeding herd.) For instance, SGE 84-5 (according to Jay Hoyt) entered into its transaction to acquire 769 breeding cows on April 1, 1984. At least 269 of SGE 84-5's "breeding cows" (the Schedule A to the bill of sale that should have listed and specifically identified these 269 cows allegedly having been lost) are reflected as producing no calves during 1984. Similarly, another important incident of breeding herd ownership would be the detriment suffered from losses to that herd.[20]

---

[20]The Hoyt organization issued certain warranties to the cattle-breeding partnerships that entered transactions with it. For instance, Ranches (as the "seller" of the breeding cattle) generally agreed to replace any cattle that could no longer serve as breeding cattle during a 10-year period. Similarly, Management (which managed a partnership's "breeding herd") further guaranteed there would be a 10-percent annual increase in the size of the partnership's "breeding herd". However, according to certain Hoyt organization records, the Hoyt organization for a number of years had been greatly "in arrears" on its "warranty obligations" to the cattle-breeding partnerships and by about 1990 "owed" over 5,000 breeding cattle to the

(continued...)

Neither does the Court believe these and other accounting deficiencies were inadvertent and attributable to a lack of proper accounting training on the part of Jay Hoyt and other individuals preparing these records. Several former Hoyt organization workers testified that, over the years, substantial fictitious cattle information was created and entered in the Hoyt organization's computerized cattle records. These witnesses included: (1) Robert Baker, who was hired by Jay Hoyt in June 1984 to design a computerized cattle record keeping system for the Hoyt organization and then established and managed the Hoyt organization's computerized cattle record keeping system from about 1985 through 1987,[21] (2) Terry Hawkins (Mr. Hawkins), who

---

[20](...continued)
partnerships. These "warranty obligations" apparently were never satisfied.

[21]Mr. Baker testified that, because of the Bales case litigation, he had been given a May 1985 deadline to establish the Hoyt organization's computerized cattle records. See Bales v. Commissioner, T.C. Memo. 1989-568. As a result, he began by entering information and generating computer records "capturing" the Hoyt family's and Hoyt organization's past 32 years of cattle operations. He related that Jay Hoyt had also furnished him with a list of random sires to use in assigning specific sires to many individual cattle whose sires, in fact, were unknown. He added that he had been instructed by Jay Hoyt to follow a similar procedure in "capturing" the Hoyt organization's subsequent "cattle inventories" and in registering large numbers of cattle with the ASA. He stated that he attempted to match and attribute each calf to a "random sire" that had the same matching physical characteristics. He further acknowledged that the Hoyt organization's registering of calves from unknown sires as being offspring of known sires violated the ASA's registration rules, as the random sires he assigned to calves, in many cases, were
(continued...)

from around 1987 through 1992 helped to maintain many of the Hoyt

organization's cattle records (including obtaining information on

cattle kept at numerous locations), and (3) Donna Schnitker (Mrs.

Schnitker), who as Management's cattle marketing director handled

Management's cattle sales to third parties.  The Court found the

testimony of these individuals to be credible and trustworthy.[22]

---

[21](...continued)
unrelated, nonsibling bulls.  In addition, Mr. Baker testified
that sometimes, when the Hoyt organization would be selling an
animal to a third party, he had been instructed to fabricate a
false pedigree for that animal, which he did.

[22]Indeed, much of these witnesses' testimony regarding the
Hoyt organization's deceptive cattle marketing practices and its
fabrication of pedigree and other cattle record information is
corroborated by Jay Hoyt's own May 27, 1987, written comments to
an Apr. 22, 1987, memorandum that Mr. Baker had submitted to Ric
Hoyt.  The following is an excerpt of some of Jay Hoyt's comments
to certain of the complaints expressed in Mr. Baker's memorandum:

> [Mr. Baker's first complaint]:  Louie's [a cattle
> manager handling public cattle sales to third parties]
> 'special' deals are starting to mess up the SPR [i.e.,
> Shorthorn performance records] side of cattle office.

> [Jay Hoyt's comment]:  What percentage?  100
> percent - etc.

> [Mr. Baker's next complaint]:  I created a paper
> for Louie because the dam had to be by Instant Replay
> so the calf could be registered sired by Copyright.
> The calf is rejecting on the SPR weaning sheet because
> the dam is not enrolled in SPR and is not in computer.
> I don't want her in the computer because she doesn't
> exist.

> [Jay Hoyt's comment]:  How does R.W. [Mr. Baker]
> know she does not exist.  R.W. just knows she
> disappeared.  She might be at Mayo's, left in
> California, etc.

(continued...)

      *    *    *    *    *    *    *

[Mr. Baker's next complaint]:  We have to go in and change birth weights in the calf file because they're too high.

[Jay Hoyt's comment]:  That's R.W.'s job - He doesn't deal with customers and know what they want.

[Mr. Baker's next complaint]:  Louie takes a bull paper or steer paper that died or was slaughtered and uses them for bulls he's selling without regard of what it does to me.

[Jay Hoyt's comment]:  What it does to R.W. is gives him a job.  He has absolutely no understanding where the money comes from to run his office.  <u>This is our fault</u>.  He had a chance to turn a paper into cash that would not have been if he had his way.  That should be a success and not a problem.

[Mr. Baker's next complaint]:  The progeny history of the cow doesn't match, a true picture of the cow's history can never be assured because we don't know if its her real calf or not, and when we get slaughter information back we can't put it in on the right animal because he's a bull and was sold.

[Jay Hoyt's comment]:  What percentage?  This one is sad.  It shows how serious the problem is.  The carcass data should just be attached to a <u>copy</u> of the paper and entered.  The bull goes in the sale DATA. The data is STILL included in every place needed for Seth [Jay Hoyt's brother] and I.  We don't need the original paper to do our tracking.  All that must be done is to record what happened on the copy of the paper.

[Mr. Baker's next complaint]:  That messes up what I tell you, USDA, and Seth.  I have to take up untold hours finding red calves that have red sires and red dams, knowing full well the sire has to be taken with a grain of salt.  All of these things are easy for Louie

(continued...)

The record further includes a February 4, 1991, memorandum of Jay Hoyt to certain workers in the Hoyt organization, instructing them not to include information on cattle deaths in the cattle inventory records and to place such information under a "new smoke screen file name".[23]  See also infra note 25.

The Court finds the herd recap sheets the Hoyt organization prepared highly suspect and unreliable, as the Hoyt organization failed to employ good record-keeping practices and did not prepare the recap sheets and its other cattle records in accordance with standard, fundamental accounting principles.  The

---

[22](...continued)
because he just says make it work.  It's a nightmare for us because we have to cover the tracks and make sure everything fits together.

   [Jay Hoyt's comment]:  WRONG.  R.W. has never been instructed or asked 'to cover anyone's tracks'.  His job is to record what happens IN THE OPEN, in front of everyone.  His personal protection is provided by the Policy.  We take the responsibility.  I sense R.W. will think 'if the Policy said kill someone would that be OK, and wouldn't I be held accountable?'  Sure, but R.W. is not asked to kill anyone.  He is asked to provide them with a gun and shells.  He knows what they are going to do with it, sure, but he isn't doing it. They don't put gun sellers in jail when the gun kills someone.  We are dealing with the real live problem of giving the marketing people what they ask for and only they will be held accountable for what they do with it if R.W. documents it with Louie's or Ric's instructions.  R.W. just records what they did with what he produced under their instructions.

[23]In this same Feb. 4, 1991, memorandum, which was discussed earlier, Jay Hoyt had also instructed these workers to register with the ASA a calf for each cow bred, not just existing, "live calves".  See supra note 10.

Court can also see no good reason or justification for the Hoyt organization's preparing these annual herd recap sheets and other cattle records in this highly deficient manner--if each cattle-breeding partnership, as petitioners maintain, indeed "owned" anywhere near the number of specific breeding cattle stated in its "bill of sale".[24]  Indeed, the Court finds that the herd recap sheets and other records were prepared in this manner because the requisite numbers of specific breeding cattle did not exist and could not, in fact, be assigned to each partnership.[25]

C.  The Court's Evaluation of the Cattle Counts Conducted by Mr. Daily and Mr. Favre

Mr. Daily and Mr. Favre counted the cattle over essentially the same time period from fall 1992 through spring 1993.[26]

---

[24]As discussed previously, the record does not contain any of the alleged bills of sale for years after 1987 that Jay Hoyt claimed were issued by the Hoyt organization to cattle-breeding partnerships.

[25]The record contains a handwritten note of Jay Hoyt to one of the Hoyt organization's cattle managers.  This note states, in pertinent part:

The cattle numbers we used in the loan application are the numbers in the computer and balance to the books. They are the numbers.  Any difference between them and yours are assigned to location 'Ric'.  It's his job to get them accounted for.  Not yours or mine.  This is to be 'fixed' with the equity in his place.  Don't say they don't exist, say they are not in the herd I'm responsible for.  Ric has failed to account for almost 2,000 head.  Might explain why he acts so nervous-spooky.

[26]See supra note 16, describing how they wound up

(continued...)

However, there is a tremendous disparity between the total number of cattle each of them counted and determined were present.

Mr. Daily, as reflected in his report, determined the cattle present in the Hoyt organization herd that might belong to the cattle-breeding partnerships and counted the following numbers of cattle in the categories indicated:

| Category | Mature Cattle | Total Cattle |
|---|---|---|
| Cows | 3,115 | 3,115 |
| Bulls | 761 | 1,619 |
| Breeding heifers | 888 | 1,596 |
| Feedlot heifers | -- | 182 |
| Timeshares Breeding Service heifers | -- | 477 |
| Calves | -- | 904 |
| Steers | - | 10 |
| Total | 4,764 | 7,903 |

Mr. Daily further confirmed that there were 90 bulls on loan to ranchers under the borrow-a-bull program. He further counted 2,066 steers and heifers at the Miller Feed Yard in Lasalle, Colorado, and 889 steers and heifers at the North Platte Feed Yard in North Platte, Nebraska, but did not include these cattle with those possibly belonging to the partnerships, because the feedlot managers had told him the cattle belonged to Ric Hoyt and were being raised for slaughter.

Mr. Favre, on the other hand, as reflected in his report, determined to be present and counted the following numbers of

---

[26](...continued)
undertaking separate counts.

cattle in the categories indicated:

| Category | Cattle |
|---|---|
| Cows | 3,991 |
| Bulls | 1,819 |
| Heifers | 5,397 |
| Heifers and steers | 470 |
| Mixed age cattle | 97 |
| Timeshares Breeding Services bulls | 2,436 |
| Timeshares Breeding Services heifers | 3,271 |
| Calves | 8,486 |
| Steers | 238 |
| Total | 26,205 |

The cattle numbers contained in Mr. Favre's report were based on tally sheets he compiled in counting the cattle. These tally sheets disclose the particular location and the cattle manager. The majority of the tally sheets further contain columns in which to record the tag number, tag color, sex, color, brand, class, etc., of individual cattle. However, in some of the tally sheets, Mr. Favre did not record any of this information, but he recorded only total numbers of cattle and type of cattle. Further, as reflected by the cattle tag numbers that are recorded on Mr. Favre's tally sheets, there were numerous instances where he counted the same cattle more than once. Indeed, on brief, petitioners concede there were duplications but argue the duplication rate to be only 9.6 percent. Petitioners thus assert there were still a total of 23,689 cattle (the 26,205 total cattle Mr. Favre determined were present, less a 9.6-percent discount).

The Court has reviewed the accuracy of the cattle numbers in Mr. Daily's and Mr. Favre's respective reports. Generally, the Court found Mr. Daily's numbers fairly reliable, although it is possible he may have missed or omitted relatively small numbers of cattle. It is further to be noted that, in a number of instances, Mr. Daily obtained signed statements in which the Hoyt organization cattle managers at particular locations essentially agreed with the numbers of cattle Mr. Daily had counted at those locations. In contrast, the Court found a number of instances where Mr. Favre's report numbers were significantly at variance with his tally sheets. Moreover, an even more substantial problem exists with respect to his counting the same cattle more than once. Our examination indicates that his actual duplication rate may far exceed the 9.6-percent duplication rate petitioners have conceded.

Mr. Favre stated that he returned to certain locations to count new cattle that had arrived at those locations. He claimed he avoided counting again any cattle he had already counted, because, according to him, he would have recognized if he had seen those cattle before by their appearance and through using his intuition. In a related connection, Jay Hoyt did testify that different colored tags were used by the Hoyt organization in various parts of the country and that sometimes the same tag number might appear on the different colored tags worn by two

separate animals.  However, this testimony of Jay Hoyt still does not satisfactorily explain the large number of duplicate tag numbers found in Mr. Favre's tally sheets.  With only a few exceptions, the tally sheets either disclose no tag color for the duplicate tag numbers involved or reflect that those duplicate tag numbers were for the same tag color.

The Court has major problems with Mr. Favre's cattle numbers and does not consider those numbers to be reliable.  Though it has confidence in the cattle count performed by respondent's expert Mr. Daily, the Court has no confidence in the reliability of Mr. Favre's numbers because it does not believe Mr. Favre's count to have been performed in a competent and proficient manner.  As indicated previously, Mr. Daily was accepted by the Court as an expert on cattle counting and cattle appraisal and had extensive prior professional experience in counting and evaluating cattle.  In the cattle count he conducted of the Hoyt organization herd, Mr. Daily further was assisted by an experienced crew.  In contrast, Mr. Favre testified as a fact witness, and his report was accepted in evidence as a business record of the Hoyt organization.  Mr. Favre also had only rather limited prior experience in counting and evaluating cattle, and his level of experience and expertise was substantially below that of Mr. Daily.  In conducting his count, Mr. Favre was assisted by Jay Hoyt and other of the Hoyt organization's cattle

people.

In connection with evaluating the reliability of Mr. Favre's cattle count numbers, the Court further considers noteworthy that, in a combined report Mr. Favre and certain of the Hoyt organization cattle people issued later in February of 1994, they, among other things, asserted that thousands of cattle in the Hoyt herd had perished from 1988 through 1992 as a result of drought conditions. However, as discussed more fully infra note 31, the Court finds dubious this assertion of Mr. Favre and these other individuals.

On the basis of the foregoing discussion and the credible evidence of record, the Court concludes that, as of April 1993, the Hoyt organization herd included 3,150 cows, 1,855 bulls, 2,000 heifers, 1,000 Timeshares Breeding Services heifers, and 2,300 calves. In arriving at these numbers, we have adjusted and modified the cattle numbers Mr. Daily determined in some situations where we felt it appropriate. It is to be noted, however, that this still does not provide us with the numbers of mature breeding cattle contained annually in the Hoyt organization herd during the period from 1987 through 1992.

D.  The Total Numbers of Breeding Cattle Present During 1987 Through 1992

Again (as was the case with the numbers of cattle determined in Mr. Daily's and Mr. Favre's respective cattle counts) there is a wide disparity in the numbers of breeding cattle the parties

contend were present and available annually from 1987 thorough

1992 to be "owned" by the cattle-breeding partnerships.  Mr.

Daily (respondent's expert) estimated the following total numbers

of cattle, consisting of breeding cattle and calves, were present

annually on the dates indicated:

| | Mature Breeding Cattle | | | | | |
| | | | Bred | | | Total |
| Date | Bulls | Cows | Heifers | Subtotal | Calves | Cattle |
|---|---|---|---|---|---|---|
| 1-1-87 | 765 | 3,912 | 520 | 5,197 | 4,725 | 9,922 |
| 1-1-88 | 546 | 4,246 | 374 | 5,166 | 3,397 | 8,563 |
| 1-1-89 | 550 | 2,920 | 513 | 3,983 | 2,336 | 6,319 |
| 1-1-90 | 987 | 3,103 | 550 | 4,640 | 2,482 | 7,122 |
| 1-1-91 | 1,124 | 3,498 | 667 | 5,289 | 2,798 | 8,087 |
| 1-1-92 | 761 | 3,115 | 583 | 4,459 | 3,119 | 7,578 |

Mr. Daily based his above 1987 cattle figures on an inventory of

the Hoyt organization's cattle dated January 1, 1987.  This

inventory listed a total of 13,481 animals of all classes and

ages.[27]  Mr. Daily examined the locations, types of cattle, and

---

[27]In their stipulation, the parties agreed that all joint exhibits (including the Jan. 1, 1987, inventory) were true copies of the original and that (although all other evidentiary objections were reserved) any objections as to authenticity were waived.  The Jan. 1, 1987, inventory is further listed and described in the stipulation as being "a cattle inventory dated January 1, 1987, prepared by Gayle Wallace.  It indicates that there were a total of 13,481 head of all cattle of all classes and ages as of that date."  However, in the stipulation, petitioners further stated they did not agree with the description given numerous joint exhibits listed therein, including the Jan. 1, 1987, inventory.  On brief, petitioners dispute there is any evidence in the record establishing this inventory was prepared by Gayle Wallace.  (Ms. Wallace was a Hoyt organization worker who in 1987 had worked together with Mr. Hawkins in helping maintain the Hoyt organization's cattle records.  They further maintain that it and certain other Hoyt organization cattle inventories in the record are not inventories

(continued...)

cattle numbers listed therein and concluded the inventory represented a reasonable starting point from which to estimate the numbers of cattle present annually from 1987 through 1991. He arrived at his 1988 through 1991 cow figures by examining the Hoyt organization's calving records for those years and concluding that an assumed calf crop rate of 80 percent would be reasonable. He arrived at his 1988 through 1991 bull figures by concluding that a ratio of one bull to every 20 cows would be reasonable. His 1992 cattle figures, however, were based on his own fall 1992 through spring 1993 cattle count.

Petitioners, on the other hand, contend that much higher numbers of breeding cattle were present annually during 1987 through 1992. Jay Hoyt, in his testimony, estimated that the Hoyt herd included the following numbers of breeding cattle (which numbers he stated include some calves as well):

| Year | Total Breeding Cattle (incl. some calves) |
| --- | --- |
| 1987 | 24,000-29,000 |
| 1988 | 18,000-20,000 |
| 1989 | 16,000-18,000 |
| 1990 | 10,000-12,000 |
| 1991 | 16,000-18,000 |
| 1992 | 17,000-18,000 |

Jay Hoyt based these estimates on certain unspecified documents he claimed to have examined--presumably, including the annual

_____

[27](...continued)
of the Hoyt organization's "entire herd" and are only listings "as of a particular time, of cattle in specific locations".

herd recap sheets the Hoyt organization prepared.  For instance, although he did not elaborate and identify the specific documents upon which he relied, he claimed his 1987 estimate was based on his examination of certain 1986 and 1987 documents.  In addition, petitioners (as was earlier indicated supra note 17) maintain the annual herd recap sheets in evidence reflect the cattle-breeding partnerships to have owned the following total numbers of cattle on the dates indicated:

| Date | Total Number of Cattle |
| --- | --- |
| 1-1-87 | 22,457 |
| 1-1-88 | 25,613 |
| 1-1-89 | 23,418 |
| 1-1-90 | 17,336 |
| 1-1-92 | 22,148 |

The Court does not accept petitioners' contentions concerning the numbers of breeding cattle present during 1987 through 1992.  As was previously discussed, the Court considers much of Jay Hoyt's testimony in the instant cases evasive and less than forthright.  Accordingly, the Court does not find his cattle estimates credible.  Moreover, as was also previously discussed, the Court found highly suspect the 1987 through 1992 herd recap sheets and does not believe those herd recap sheets to be contemporaneous and reliable documents.

The credible evidence in the record essentially confirms and supports Mr. Daily's estimates of breeding cattle that were present during 1987 through 1992.  Mrs. Schnitker, who served as

Management's cattle marketing director from 1987 through 1990,[28] estimated Management during those years managed a total of 5,000 cattle annually.  Of the 5,000 total cattle, she further estimated 3,000 were mature female cows and another 1,000 cattle consisted of weaned male and female calves.  She also related that the total numbers of cattle annually present stayed about

---

[28]Mrs. Schnitker had begun working for the Hoyt organization as Ric Hoyt's secretary.  She eventually became Ric Hoyt's assistant, as he traveled extensively on business and was out of the office for substantial periods during the year.  In addition, she had some background in the cattle business and was familiar with the required paperwork, as her husband (who also worked for the Hoyt organization) previously had worked on several ranches. Mrs. Schnitker became Management's cattle marketing director in late 1987, when Ric Hoyt either left the Hoyt organization or reduced his activities on the Hoyt organization's behalf.  She served as Management's cattle marketing director from late 1987 through July 31, 1990.  As cattle marketing director, Mrs. Schnitker reported to another individual who served as Management's general manager.  In connection with being cattle marketing director, Mrs. Schnitker had to see that sufficient cattle were sold to generate the funds Management needed to pay its operating expenses.  In addition, she was responsible for Management's cattle registration department and was Mr. Hawkins' supervisor.  (As indicated previously, Mr. Hawkins helped maintain the Hoyt organization's cattle records.)  Mrs. Schnitker related that generally the cattle sold to third parties were mostly bulls and steers and included only a few cows, as she had been told female breeding cattle were to be sold to the cattle-breeding partnerships.  However, she added that, on occasion, when Management's financial needs were pressing, a load of heifers would be sold.  Mrs. Schnitker further testified that she did not know whether any of the cattle sold had belonged to the cattle-breeding partnerships.  She elaborated that she relied on Mr. Hawkins for information on the cattle Management managed, as she would have to have accurate information regarding what numbers of cattle were available to be sold to meet Management's cash operating requirements.  She also stated she considered the cattle information Mr. Hawkins provided to her to be reliable, as she knew him to be a careful and meticulous individual.

the same during these years.  Tom James, who had operated and managed Timeshares Breeding Services since about 1986, testified that Timeshares Breeding Services had a total of approximately 3,133 to 3,234 cattle in 1993, and that this would have been the maximum number of cattle Timeshares Breeding Services had in its operation at any one time.[29]

Although petitioners argue far greater numbers of additional breeding cattle existed and were available to be purchased and owned by all of the cattle-breeding partnerships during 1987 through 1992, they have failed to produce any concrete, convincing evidence establishing their claim.

Most importantly, petitioners have failed to account for and establish precisely the total number of breeding cattle annually present from 1987 through 1992, which the Hoyt organization collectively managed on behalf of each of the numerous cattle-breeding partnerships it organized, promoted, and operated.  The

_____

[29]Tom James estimated that, in 1993, the Timeshares Breeding Services operation had a total of 3,133 to 3,234 cattle, consisting of the following numbers of bulls, cows, and heifers:

| Location or Parties Holding Cattle | Bulls | Cows | Heifers |
|---|---|---|---|
| Clements, CA | 410 | -- | 370 |
| Trent, TX | 33 | 255-256 | -- |
| Various Users | 265 | -- | [1]1,800-1,900 |
| Total | 708 | 255-256 | 2,170-2,270 |

[1]    Represents calves owed by users for their use of bulls in three or four breeding seasons.

Court believes that the Hoyt organization failed to provide such a full and proper accounting because the requisite numbers of individual breeding cattle it purportedly sold to and managed on behalf of these partnerships never existed. See infra note 38. Moreover, there is evidence in the record indicating that a large number of breeding cattle previously assigned to many of the partnerships may have been sold off by the Hoyt organization to meet its financial obligations.[30] In addition, as indicated earlier, the Hoyt organization had claimed that large numbers of cattle it managed on behalf of the partnerships died as a result of drought and disease during the 1987 through 1992 period—a claim the Court finds dubious.[31]

------

[30]Included in materials the Hoyt organization prepared for a special meeting in early 1990 of Hoyt & Sons Ranch Properties (another Hoyt organization entity) unit holders are statements that the Hoyt "combined herd" was now one-third its former size because of (1) the Hoyt organization's repayment of loans received from institutional lenders and (2) reductions due to the drought from 1987 through 1988. See infra note 31.

[31]In his written statement submitted to the District Court in the summons enforcement proceeding in early 1993, Jay Hoyt stated that "In 1987, 1988 and 1989, because of drought, we were forced to sell at beef prices, a substantial portion of our purebred cow herd." Similarly, a Combined Report, Analysis, And Conclusion Of Experts, dated Feb. 19, 1994 (written by Mr. Favre and several of the Hoyt organization's cattle people), asserts that, because of the drought that occurred in California, Oregon, and other western States from 1988 through 1992, the Hoyt organization was unable to determine and record the deaths of thousands of cattle. This report relates that, in 1988, the Hoyt organization decided not to sell some cows and bulls and, instead, to use the drought as part of a natural selection process that would eliminate cattle unable to forage well in poor
(continued...)

The Court concludes that petitioners have failed to establish that, during 1987 through 1992, substantially more breeding cattle were present than were estimated by respondent's expert Mr. Daily.[32]  The Court further concludes that petitioners have failed to show that breeding cattle existed in each year during this period in numbers corresponding with those

---

[31](...continued)
feed conditions.  However, Mr. Hawkins (who helped maintain the Hoyt organization's cattle records) testified that the Hoyt organization had not suffered any substantial cattle losses during this period as a result of drought or disease.  Moreover, a cattle expert for petitioners acknowledged that he would question the competence of any cattle operator that allowed a large number of cattle to perish during drought.  This expert indicated that an operator could either provide food and water to the cattle, move them, or sell them off.  In any event, petitioners have now conceded the alleged large losses for drought and disease previously claimed by the partnerships in the instant cases.  See supra note 15.

[32]On brief, petitioners note that:  (1) Petitioner's expert Mr. Hunsley (the ASA's executive director) testified that, in 1986 (when he was serving as an expert witness for the taxpayers in Bales v. Commissioner, T.C. Memo. 1989-568), he visited some of the Hoyt ranch properties in Oregon, saw perhaps 3,000 cattle, and estimated a total of 5,000 to 6,000 cattle were there; and (2) certain State of Oregon brand inspection reports covering 8,796 head of cattle were issued during 1987.  However, the Court has major reservations (which are discussed more fully infra) about Mr. Hunsley's veracity and does not give this testimony much weight.  As to the brand inspection reports, the Court has not found persuasive the numbers of cattle reflected in these reports, as a new report must be issued for cattle when their shipment out of State is delayed beyond the scheduled date.  In addition, as respondent points out, the brand inspection and other health reports in evidence do not firmly establish a definite number of total cattle, as these papers are required when cattle are moved and the same cattle may be moved more than once during a year.

purportedly purchased and owned by all of the cattle-breeding partnerships.  See Rules 142(a), 240(a).  Indeed, the 1987 bills of sale in evidence (which the Court previously determined were highly suspect and unreliable) reflect 26 newly formed partnerships alone to have purportedly purchased over 13,000 breeding cattle during that year.

E.  Whether a Partnership's Stated Purchase Price Reasonably Approximated the Cattle's Fair Market Value

Petitioners contend that the breeding cattle each partnership acquired from the Hoyt organization had a value of $4,000 per animal and that the total stated purchase price each partnership paid for its breeding cattle was reasonable.

Respondent, on the other hand, contends that during the years relevant to the instant cases, the Hoyt organization's breeding cattle had a value substantially below $4,000 per animal.  The Court essentially agrees with respondent.

In asserting their $4,000 per animal valuation, petitioners rely heavily on the testimony of their expert Mr. Hunsley.  Mr. Hunsley has been the ASA's executive director since about 1983 and was also an expert witness for the taxpayers in Bales v. Commissioner, T.C. Memo. 1989-568.  Although Mr. Hunsley had not examined the specific individual cattle the partnerships in the instant cases purportedly purchased and owned, he claimed to have seen a number of cattle in the Hoyt organization herd over the years, including at cattle shows and on visits he made to certain

of the Hoyt ranch properties in 1986 and 1989.  He related that during his visit in 1986, when he had been retained as an expert for the Bales case, he saw about 3,000 cattle and estimated there to have been a total of perhaps 6,000 cattle present.

Mr. Hunsley opined that the cattle in the Hoyt herd were in the top 25 percent of the Shorthorn breed.  He further opined that the Hoyt Shorthorn cattle had an average value of $4,000 per head during 1987 through 1992.  Mr. Hunsley noted that in the Bales case, he had also concluded the cattle he had seen during his 1986 visit were worth $4,000 per head.  He maintained that the general market prices for Shorthorn cattle had not changed significantly during 1987 through 1992.

The Court does not accept Mr. Hunsley's conclusions with respect to the value of the Hoyt herd cattle during 1987 through 1992.  Among other things, Mr. Hunsley did not address how his opinions might have to be revised if (1) a large number of the breeding cattle a partnership purportedly purchased did not, in fact, exist, or (2) the parentage or registered status of a partnership's cattle was suspect or unknown.  In addition, the Court has major reservations concerning some of the assertions Mr. Hunsley made regarding the Hoyt organization cattle.  On cross-examination by respondent's counsel, Mr. Hunsley denied knowing of any irregularities with respect to cattle the Hoyt organization registered with the ASA.  He specifically denied

that he had waived or allowed the Hoyt organization to dispense with the ASA rules requiring blood testing to verify the parentage of certain calves the Hoyt organization had registered as being produced from embryo transplants.  However, Mr. Hunsley's claims were directly contradicted by Mrs. Schnitker's later testimony.

Mrs. Schnitker explained that her husband had been involved in the embryo transplant work done by the Hoyt organization.  She related that around 1990 Jay Hoyt met with her and her husband and told them a calf had to be registered with the ASA for each embryo transplant the Hoyt organization had done, regardless of whether an actual calf had been produced.  Mrs. Schnitker said she agreed to handle the registrations, provided she could reach an understanding with Mr. Hunsley with respect to any nonexistent calves being registered.  According to Mrs. Schnitker, she and Mr. Hunsley came to such an understanding permitting the Hoyt organization to register these nonexistent calves, but he had also told her the Hoyt organization would not be allowed to register any subsequent cattle characterized as progeny of these nonexistent calves.

The Court finds Mrs. Schnitker's above testimony credible. In addition to believing her to be a trustworthy witness, the Court notes that other reliable evidence in the record corroborates various aspects of her testimony.  The record

includes a 1991 invoice for the registration work that Mrs. Schnitker issued to the Hoyt organization and a later note and a memorandum of Jay Hoyt directing other Hoyt organization workers to pay Mrs. Schnitker's invoice.[33]  Moreover, as indicated earlier, at about this same time:  (1) Jay Hoyt, in a February 4, 1991, memorandum, instructed other Hoyt organization workers to register with the ASA a calf for each cow bred, not just "live calves"; and (2) the Hoyt organization proposed to Mr. Hunsley that it be allowed to register calves with the ASA at a lower registration fee of $6 per calf, in return for promising to register a minimum of 4,000 calves annually for 1991 and 1992. See supra notes 10 and 11.  The record further includes a letter Mr. Hunsley issued to the Hoyt organization on or about February 14, 1991, in which he essentially agreed to the Hoyt organization's proposal regarding a lower calf registration fee. In that letter, Mr. Hunsley also mentioned his close work with Mrs. Schnitker in registering "embryo transplant calves".

The record reflects that petitioners' asserted valuation of $4,000 per animal is still substantially higher than the prices the Hoyt organization realized in selling cattle to independent,

---

[33]By this time, Mrs. Schnitker had left her position as Management's cattle marketing director and was no longer a Hoyt organization worker.

unrelated third parties in arm's-length transactions.[34]  Mrs.

Schnitker testified as to the prices she obtained in selling

cattle as Management's cattle marketing director from 1987

through 1990.  Her sales included sales to feedlots (whereby the

cattle essentially would be sold at meat prices) and other sales

to Shorthorn breeders.  She related that the best quality (i.e.,

"A" herd) mature breeding cows with registration papers could go

for a price as high as $2,000 or $2,500, depending upon the

individual cow's quality.  However, lesser quality cattle without

registration papers (i.e., "B" herd or lower) would sell for

---

[34]The record discloses that the Hoyt organization contrived certain transactions pursuant to which small numbers of breeding cattle (possibly "belonging" to some of the cattle-breeding partnerships) ostensibly were sold for high prices.  For instance, in an interoffice memorandum dated Dec. 9, 1985, Jay Hoyt outlined plans to have his brother Bob Hoyt and the brother's business associate "purchase" a heifer for $19,000 at one of the Hoyt organization's cattle sales to "help our sales average".  This memorandum further states that (1) Ranches would provide the brother and the brother's business associate with the funds to "purchase" the heifer and (2) the brother and business associate would "transfer" the heifer back as their capital contribution to a Timeshare partnership.  In another instance, in his memorandum dated Dec. 2, 1991, to various Hoyt organization workers, Jay Hoyt instructed the workers to have the partnership representatives line up two individuals to buy two Timeshare bulls at the Red Bluff and Klamath Falls cattle sales.  These two bulls, Jay Hoyt stated, should "sell" for $4,500 to $5,000 apiece.  He added that if the money had to be provided to the two individuals, the workers should take it out of the General Partners' Office (an office in the Hoyt organization) and should get the money back to the General Partners' Office by deducting the money out of the Feedlot Co.'s (another entity in the Hoyt organization) first check from the Red Bluff and Klamath Falls sales.  At any rate, the Court finds the bona fides of these and other similar "transactions" to be highly suspect and questionable.

substantially less.  Obviously, many of the breeding cattle
purportedly sold the partnerships were nowhere near the quality
of an "A" herd cow selling for $2,000 or $2,500.[35]  Indeed, the
registered status and parentage of a substantial number of
breeding cattle the partnerships purportedly purchased and owned
are either dubious or unknown.

We conclude the partnerships' stated purchase prices for
their "breeding cattle" were many times the actual fair market
value of those "cattle".[36]  Thus, each partnership's stated

---

[35]There is no credible evidence in the record from which the
Court can estimate the actual number of "A" herd cattle annually
in the Hoyt herd from 1987 through 1992.  The Court does not
believe Jay Hoyt's claim that, during 1987, of the 24,000 to
29,000 total cattle he estimated were present in the Hoyt
organization herd, approximately 40 percent were "A" herd
animals.  The Court thinks that, in all likelihood, the number of
"A" herd animals in the Hoyt organization herd had greatly
declined by 1987 or 1988.  Among other things, when Ranches was
liquidated, Ric and Steve Hoyt took some of the cattle Ranches
previously either owned and/or managed.  Moreover, in a
memorandum dated Sept. 17, 1990, to the Hoyt organization's
cattle and ranch managers, Jay Hoyt advised them that the "A"
herd concept was being abandoned, because, according to Jay Hoyt,
no herd sire prospect (i.e., essentially a potentially very high
quality breeding bull) had been sold in the last 2 years.

[36]The record contains a marketing plan for Management.  This
plan notes that in order for Management to make a profit on its
bulls, it will have to sell them for the following specified
prices:  (1) A weaner bull for $800, (2) a 10- to 12-month-old
bull for $1,050, (3) a 13- to 15-month-old bull for $1,320, and
(4) a 16- to 18-month-old bull for $1,600.  The plan goes on to
state that for bulls that cannot be sold at a profit, one option
is to market those bulls to "Time Share" which will "pay" $3,500
per bull.  However, it states, "Time Share" was not planning to
buy a great number of bulls from Management in 1989.  The record
further reflects that, at about this time, the Hoyt organization
(continued...)

purchase price for its cattle did not reasonably approximate those "cattle's" fair market value.

F.   Validity of the Partnerships' Notes

In deciding the extent to which a nonrecourse note has economic substance, a number of cases have relied heavily on whether the fair market value of the property acquired with the note was within a reasonable range of its stated purchase price. See Estate of Franklin v. Commissioner, 544 F.2d 1045 (9th Cir. 1976), affg. 64 T.C. 752 (1975); Hager v. Commissioner, 76 T.C. 759 (1981); see also Hilton v. Commissioner, 74 T.C. 305, 363 (1980), affd. 671 F.2d 316 (9th Cir. 1982); cf. Frank Lyon Co. v. United States, 435 U.S. 561 (1978) (where, among other things, the buyer-lessor in a sale-leaseback transaction was personally liable on the mortgage).  As the Court of Appeals for the Ninth Circuit in Estate of Franklin v. Commissioner, supra at 1048, stated, in pertinent part:

> An acquisition * * * if at a price approximately equal to the fair market value of the property under ordinary circumstances would rather quickly yield an equity in the property which the purchaser could not prudently abandon.  This is the stuff of substance.  It meshes with the form of the transaction and constitutes a sale.
>
> No such meshing occurs when the purchase price exceeds a demonstrably reasonable estimate of the fair market value.  Payments on the principal of the

---

[36](...continued)
typically "sold" bulls to various TBS partnerships for stated prices of around $3,500 per bull.

purchase price yield no equity so long as the unpaid balance of the purchase price exceeds the then existing fair market value.  Under these circumstances the purchaser by abandoning the transaction can lose no more than a mere chance to acquire an equity in the future should the value of the acquired property increase. * * *

In addition, even a purportedly recourse purchase note will not be treated as true debt where payment, according to its terms, is too contingent.  See Waddell v. Commissioner, 86 T.C. 848, 901-903 (1986), affd. 841 F.2d 264 (9th Cir. 1988). Further, the mere labeling of a purchase note as recourse is not controlling because substance, not form, must govern.  The note's recourse label thus will not preclude inquiry into the adequacy of the collateral securing an alleged purchase money debt.  See generally Waddell v. Commissioner, supra at 901-903.

In Ferrell v. Commissioner, 90 T.C. 1154, 1186 (1988), this Court held not to be bona fide debt for tax purposes certain purportedly long-term recourse purchase notes that allegedly had been assumed by limited partner investors, and elaborated as follows:

> We are fully aware of the long line of decisions of this Court and other courts that have dealt with bona fide long-term recourse notes assumed by limited partners.  In those cases, the courts have given credence to recourse notes as a basis for supporting claimed losses or establishing section 465 "at risk" amounts.  See, e.g., Pritchett v. Commissioner, 827 F.2d 644 (9th Cir. 1987), revg. and remanding 85 T.C. 580 (1985) (at risk under sec. 465); Follender v. Commissioner, 89 T.C. 943 (1987) (at risk under sec. 465; partnership's basis); Melvin v. Commissioner, 88 T.C. 63, 75 (1987) (at risk under sec. 465); Abramson

v. Commissioner, 86 T.C. 360 (1986) (partnership's basis; at risk under sec. 465).

In all those cases, however, the recourse notes were given to independent third parties whose interests did not necessarily coincide with those of the note makers. Those cases did not involve, as does the instant case, transactions between two organizations created to carry out a tax shelter scheme, notes given for amounts having no relationship to economic reality, or notes which almost certainly would not be paid. See Goldstein v. Commissioner, 364 F.2d 734, 740-741 (2d Cir. 1966), affg. 44 T.C. 284 (1965); Durkin v. Commissioner, 87 T.C. 1329, 1376-1377 (1986); Waddell v. Commissioner, 86 T.C. 848, 902 (1986), affd. 841 F.2d 264 (9th Cir. 1988); Houchins v. Commissioner, 79 T.C. 570, 589-590 (1982).

In the instant case, we are convinced, as stated above, that the purportedly recourse  * * *  notes served merely as a facade for the support of the tax benefits promised the investors  * * *.  The possibility that the notes would be paid was illusory. * * *

In Ferrell v. Commissioner, supra, the Court based its conclusion regarding the invalidity of the notes on several factors:  (1) The note holder's not being an independent party but an essential member of the tax shelter team; (2) the amounts of the notes being many times the value of the property acquired; (3) the unusual form of the notes, including the extremely long term for payment of any of the notes' principal; and (4) the prearranged eventual release of the investors from their "assumptions of personal liability" on the "recourse" notes.  See id. at 1186-1190.

In the instant cases, the Court is convinced that Jay Hoyt and the Hoyt organization never intended to enforce the cattle-

breeding partnerships' purportedly recourse notes against a partnership and its partners on a genuinely recourse basis. In that regard, the Court does not find believable Jay Hoyt's testimony to the contrary.

Jay Hoyt testified that although the cattle-breeding partnerships formed before 1986 (including several of the seven in the instant cases) had been limited partnerships, by about 1986 many of them had been converted to general partnerships following the execution of restated partnership agreements for them. Even before this conversion, he added, limited partner investors had executed assumption agreements, pursuant to which they agreed to be fully personally liable for all amounts owed under the "Full Recourse Promissory Note" their partnership had issued for its purchased breeding cattle. He related that he typically had signed an individual investor's name to an assumption agreement on behalf of that investor, pursuant to a power of attorney the investors had granted him.[37]

---

[37]Many of the alleged partnership agreements, promissory notes, and other related documents that purportedly were executed during the 1987 through 1992 period do not appear in the record. Jay Hoyt claimed that these documents were unavailable because they had been seized by postal inspectors from the Hoyt organization's offices in June 1995. However, as indicated earlier supra note 19, the postal inspector who conducted the seizure also testified. This postal inspector related that he had (1) provided Jay Hoyt with an inventory of the seized documents shortly after the seizure was effected, and (2) later (a) offered Jay Hoyt and other Hoyt organization representatives access to the seized documents and (b) provided them with copies
(continued...)

However, as the Court previously determined, the stated purchase prices for a partnership's "breeding cattle" greatly exceeded those cattle's fair market value.  Neither were these arm's-length transactions.  Jay Hoyt, as managing general partner, represented each partnership in these transactions and other Hoyt organization entities "sold" and then "managed" the "breeding cattle" that a partnership had purportedly purchased. The Hoyt organization greatly inflated the stated purchase prices in order to increase the potential tax benefits for investors.

In addition, as was noted earlier, the Hoyt organization well before 1987 could never properly account for all the specific individual breeding cattle that purportedly were "purchased and owned" by the numerous cattle-breeding partnerships it organized and operated over the years.  This manifested itself in the many accounting deficiencies and irregularities in the Hoyt organization's cattle management and record-keeping practices.  Indeed, petitioners have been unable to establish that breeding cattle existed from 1987 through 1992 in numbers corresponding to those purportedly purchased and owned by all of the cattle-breeding partnerships.

The Hoyt organization further allowed a number of defaulting investors to walk away from their partnership's alleged recourse

[37](...continued)
of the seized documents.

promissory note debt.  In his testimony, Jay Hoyt maintained that he and the Hoyt organization had concluded it was not practical to bring collection actions against a large number of defaulting investors.  He further stated that as a "general principle" the Hoyt organization assumed that the "cattle" securing a defaulting investor's "note liability" had a value equal to 110 percent of that "note liability".  However, the Court does not believe Jay Hoyt's explanation as to why the Hoyt organization never sought to enforce the "note liability" against these defaulting investors.[38]

In his testimony, Jay Hoyt also noted that certain of the cattle-breeding partnerships had almost "fully paid off" their "promissory note liabilities" with respect to some earlier cattle purchase transactions that they and the Hoyt organization had entered into.  He further indicated that, in substantial part, these notes had been "paid off" through these partnerships' "transferring back" cattle to the Hoyt organization.  However, the Court does not consider such "payments" to be convincing

_____

[38]Among other things, the record contains standard letters a large group of disgruntled investors (who were allowed to withdraw from their cattle-breeding partnerships) issued to the Hoyt organization in 1994 and 1995.  In the letters, these investors noted that the Hoyt organization had represented that the investors would owe no further money because their respective cattle partnership's assets had a value sufficient to cover an investor's "note liability".  If not, the letters advised, these investors requested a full accounting by the Hoyt organization with respect to all cattle that had been owned by their partnerships.

evidence establishing those notes and other subsequent notes various cattle-breeding partnerships issued were valid recourse indebtedness. In a number of instances, the Hoyt organization set highly inflated values on the cattle the partnerships "transferred back" to it in "note payments". For instance, a Hoyt organization note payment summary and a payment receipt reflect that, in late 1987, SGE 82-1 transferred to the Hoyt organization 82 registered Shorthorns having a stated total value of $697,750 (which works out to an average stated value per cow of approximately $8,508) and that the Hoyt organization credited this $697,750 "payment" against SGE 82-1's promissory note, allocating $232,122 to interest and $465,528 to principal. The Hoyt organization further, over the years, contrived other transactions pursuant to which small numbers of breeding cattle (possibly "belonging" to some of the cattle-breeding partnerships) were purportedly sold for allegedly high prices at public cattle sales. See supra note 34.

This highly unusual conduct by the Hoyt organization with respect to these alleged recourse partnership debts casts considerable doubt upon the bona fides of the "recourse promissory notes" the partnerships issued to the Hoyt organization. In the subsequent note payment "transactions", Jay Hoyt and the Hoyt organization placed grossly inflated "values" on certain alleged cattle a partnership "transferred back" to the

Hoyt organization, because the "payment" was only "applied" against the grossly inflated stated purchase price that partnership previously purportedly agreed to pay for its "breeding cattle". In actuality, the Hoyt family and the Hoyt organization never contemplated that each partnership's promissory note would ever have to be paid by that partnership and its partners on a genuinely recourse basis.

Jay Hoyt and the Hoyt organization entities involved in the partnerships' breeding cattle purchase transactions were not independent parties acting at arm's length. Their actions evidence that they themselves viewed the partnership notes as essentially being illusory and having no practical economic effect and that the notes were merely a facade to support the tax benefits Jay Hoyt and the Hoyt organization had promised investors in the partnerships. See Ferrell v. Commissioner, 90 T.C. at 1186-1190; see also River City Ranches #4, J.V. v. Commissioner, T.C. Memo. 1999-209; Hunter v. Commissioner, T.C. Memo. 1982-126 n.17.

For the foregoing reasons and on the record presented, the Court concludes that the partnership notes were not valid indebtedness.

G.  Conclusions[39]

DF #1, SGE 82-1, DGE 84-3, SGE 84-5, DGE 86-2, TBS 89-1, and

TBS 90-1 claimed to have acquired large numbers of breeding

cattle which did not exist.  In addition, the annual herd recap

sheets and other records petitioners offered were not reliable

and contemporaneous documents.  Each partnership's stated

purchase price for its breeding cattle did not reasonably

_____

[39]On brief, petitioners assert that this Court's prior decision in Bales v. Commissioner, T.C. Memo. 1989-568, collaterally estops respondent from relitigating a number of issues concerning the transactions in the instant cases. However, petitioners failed to raise collateral estoppel as a defense in their pleadings.  The Court thus does not consider petitioners' collateral estoppel argument to be properly before it.  In any event, collateral estoppel would not apply in the instant cases.  The Bales decision involved several cattle-breeding partnerships organized by the Hoyt family that had entered into earlier transactions to acquire breeding cattle. However, the years in issue in Bales generally were 1977, 1978, and 1979.  The instant cases, in contrast, involve partnerships (which other than DF #1 were not involved in Bales) that well after 1979 entered into transactions to acquire breeding cattle from the Hoyt organization.  The years in issue for the partnerships in the instant cases are 1987 through 1992.  Most importantly, as the Court has determined, by the early 1980's the Hoyt organization's cattle management and record-keeping practices had changed dramatically.  The issues in the instant cases thus are not identical to those decided in Bales and collateral estoppel cannot apply, as different transactions and substantially different controlling facts are presented.  See Peck v. Commissioner, 90 T.C. 162, 166-167 (1988), affd. 904 F.2d 525 (9th Cir. 1990); see also Commissioner v. Sunnen, 333 U.S. 591, 599-600 (1948) ("where two cases involve income taxes in different taxable years, collateral estoppel must be used with its limitations carefully in mind so as to avoid injustice.  It must be confined to situations where the matter raised in the second suit is identical in all respects with that decided in the first proceeding and where the controlling facts and applicable legal rules remain unchanged.").

approximate the cattle's fair market value. The alleged recourse promissory note each partnership issued was not a valid recourse indebtedness. In some instances, the Hoyt organization attributed and reallocated certain breeding cattle originally assigned to and "owned" by one partnership to another partnership. Accordingly, we hold that DF #1, SGE 82-1, DGE 84-3, SGE 84-5, DGE 86-2, TBS 89-1, and TBS 90-1 did not acquire the benefits and burdens of ownership with respect to the breeding cattle each had purportedly acquired. See Ferrell v. Commissioner, supra at 1186-1190; Grodt & McKay Realty, Inc. v. Commissioner, 77 T.C. at 1237-1238. We further hold that these foregoing partnerships are not entitled to the depreciation deductions they claimed upon such breeding cattle during the years in issue.

Issue 2. Interest Deductions

As discussed supra in connection with parts E and F of Issue 1, the Court has concluded that the purported recourse promissory notes DF #1, SGE 82-1, DGE 84-3, SGE 84-5, DGE 86-2, TBS 89-1, and TBS 90-1 each issued to the Hoyt organization in transactions subsequent to those involved in Bales v. Commissioner, T.C. Memo. 1989-568, were not a valid indebtedness. Accordingly, we hold that these foregoing partnerships are not entitled to the interest deductions they claimed for the years in issue with respect to those notes.

The record further reflects that DF #1, during some of the years in issue, also claimed interest deductions with respect to certain notes it issued in connection with transactions that might have been the subject of the Bales decision. These alleged interest payments were "made" by the partnership purportedly transferring back (at inflated values) "cattle" to the Hoyt organization. For instance, a Hoyt organization payment summary and a payment receipt reflect that, in early 1987, DF #1 transferred to the Hoyt organization 14 heifers having a stated total value of $111,056 (which works out to an average stated value per heifer of just under $8,000) and that the Hoyt organization credited this $111,056 "payment" against three of DF #1's promissory notes, including two notes that DF #1 issued, respectively, in 1976 and 1977. The payment summary further reflects that the Hoyt organization credited this $111,056 "payment" against the three notes, allocating $13,231 to interest and $97,925 to principal.

We are aware that the DF #1 notes issued in connection with the transactions involved in Bales were previously determined by this Court to be valid recourse indebtedness. However, in the instant cases, the Court does not believe DF #1 to be entitled to interest deductions on those notes for the years in issue. As indicated previously, petitioner's collateral estoppel claim is not properly before the Court. See supra note 39. Moreover, by

the years in issue, the controlling facts had changed materially. Among other things, by this time, the Hoyt organization's cattle management "practices" had changed so that DF #1 "owned" (for tax purposes) few, if any, actual individual breeding cattle. It is thus extremely likely that the "14 heifers" purportedly "transferred back" by DF #1 to the Hoyt organization in "payment" of these notes (1) did not, in fact, exist and/or (2) were not "owned" by DF #1 for tax purposes. See also the discussion infra concerning Issue 8. We hold that DF #1 is not entitled to the interest deductions it claimed for the years in issue on those notes.

## Issue 3. Certain Farm and "Other" Deductions[40]

As discussed supra in connection with Issue 1, the Court has concluded DF #1, SGE 82-1, DGE 84-3, SGE 84-5, DGE 86-2, TBS 89-1, and TBS 90-1 did not acquire the benefits and burdens of ownership with respect to the breeding cattle each partnership claimed to have acquired from the Hoyt organization. Accordingly, we hold that these foregoing partnerships are not entitled to the farm deductions they claimed for the years in issue.

Petitioners have further failed to substantiate the "other deductions" DF #1, SGE 82-1, and DGE 84-3 claimed for the 1990

---

[40]As indicated earlier, petitioners conceded the deductions these cattle-breeding partnerships claimed for drought and disease.

and 1991 tax years. Consequently, we sustain respondent's determinations in the FPAA's disallowing DF #1, SGE 82-1, and DGE 84-3 those deductions for the 1990 and 1991 tax years. See Rules 142(a), 240(a).

Issue 4. Deductions for Guaranteed Payments

Petitioners assert that DF #1, SGE 82-1, DGE 84-3, SGE 84-5, DGE 86-2, TBS 89-1, and TBS 90-1 are entitled to deductions for the years in issue for certain guaranteed payments made to Jay Hoyt during those years.

Section 707(c) allows a deduction for a partnership for guaranteed payments to partners. Such payments are determined without regard to the partnership income and are payments to a partners for services or the use of capital. See sec. 707(c). To be deductible by the partnership, the guaranteed payments must meet the requirements of section 162; they must be ordinary and necessary expenses, reasonable in amount, and incurred in a trade or business. See Durkin v. Commissioner, 87 T.C. 1329, 1376-1377 (1986), affd. 872 F.2d 1271 (7th Cir. 1989); sec. 1.707-1(c), Income Tax Regs.

In deciding whether the payments are deductible under section 162(a), the Court must look to the nature of the services performed by the general partners rather than to their designation or treatment by the partnership. See Durkin v. Commissioner, supra at 1388-1389. Payments allocable to

organizational costs and syndication expenses must be capitalized.  Organizational costs, if elected, are amortizable.  See secs. 263, 709.  Petitioners have the burden of proving what portion of the fee is allocable to nondeductible capital portions and to deductible expense portions, and such allocation must reasonably comport with the value of the services performed.  See Durkin v. Commissioner, supra at 1389.  Any fees for services to be rendered in the future are not deductible in the year of expenditure.  See id.  Whether payments to a partner represent a reasonable compensation for services is a question of fact to be determined on the basis of the particular circumstances of each case.  See id.

In the instant cases, the evidence presented on the payments these partnerships made to Jay Hoyt is most unsatisfactory.  The record includes a copy of DGE 84-3's partnership agreement.  It provides that the managing general partner, Jay Hoyt, is to receive a fee equal to 5 percent of that partnership's profits.  Copies of the partnership agreements of the other partnerships for the years in issue are not in the record.  However, Jay Hoyt testified that he received a fee equal to 1 percent of a partnership's gross farm income.

Petitioners have failed to establish that the alleged payments each of these partnerships made to Jay Hoyt are deductible under section 162(a) by that partnership.  Petitioners

provided scant information concerning (1) the nature of the services Jay Hoyt performed for that partnership and (2) whether the payments represented reasonable compensation for those services Jay Hoyt rendered. Thus we hold that DF #1, SGE 82-1, DGE 84-3, SGE 84-5, DGE 86-2, TBS 89-1, and TBS 90-1 are not entitled to the deductions for guaranteed payments they claimed for the years in issue.[41] See Durkin v. Commissioner, supra at 1388-1389.

## Issue 5. IRA Deductions

DF #1, DGE 84-3, and SGE 84-5 claimed deductions for some of the years in issue for alleged individual retirement account (IRA) contributions they made for certain of their partners.

On brief, respondent concedes some of the claimed contributions DF #1, DGE 84-3, and SGE 84-5 made have been substantiated. The Court thus holds that these foregoing partnerships are entitled to IRA deductions for the years in issue in the amounts respondent conceded. The Court further holds that these partnerships have not substantiated and are not entitled to their claimed IRA deductions for the years in issue in excess of the amounts respondent conceded. See Rules 142(a), 240(a).

---

[41]It is thus unnecessary for the Court to decide whether, for purposes of sec. 707(c), the payments Jay Hoyt received were determined without regard to partnership income, an issue upon which the parties disagree.

Issue 6.  Accounting and Tax Return Preparation Fees Deductions

SGE 82-1, DGE 84-3, SGE 84-5, and TBS 90-1 each claimed deductions for accounting and tax return preparation fees for its 1992 tax year.

Petitioners have failed to present sufficient evidence substantiating that SGE 82-1, DGE-84-3, SGE 84-5, and TBS 90-1 paid such accounting and tax preparation fees.  Consequently, we sustain respondent's determinations in the FPAA's disallowing the deductions these foregoing partnerships claimed for the 1992 tax year in issue.  See Rules 142(a), 240(a).

Issue 7.  Investment Tax Credits

Petitioners claim that DGE 84-3 and SGE 84-5 are entitled to investment credits for 1987 for cattle each partnership purchased in 1984.  They maintain that under the earlier settlement concluded for these partnerships for 1984 through 1986, the cattle were excluded and not depreciated by each partnership for those years.  Petitioners argue that these "excluded" cattle were thus placed in service in 1987 and that DGE 84-3 and SGE 84-5 are entitled to investment credits under certain transition rules provided to section 38 concerning property purchased under a binding contract.

As discussed supra in connection with Issue 1, the Court concluded DGE 84-3 and SGE 84-5 did not acquire the benefits and burdens of ownership with respect to the breeding cattle each

partnership claimed to have acquired.  Accordingly, we hold that DGE 84-3 and SGE 84-5 are not entitled to investment credits for the years in issue.

Issue 8.  Capital Gains and/or Additional Farm Income

In the respective FPAA's issued to DF #1, SGE 82-1, DGE 84-3, SGE 84-5, and TBS 89-1 for their 1988, 1989, 1990, 1991, and/or 1992 tax years, respondent determined that (1) each partnership had additional farm income from its transfer to a Hoyt organization entity of calves produced by that partnership's breeding herd, and (2) certain income these partnerships reported from the sale of some of its breeding cattle and breeding value certificates[42] was ordinary income, rather than capital gains.

As discussed supra in connection with Issue 1, the Court has determined that, during the period covering the 1988 through 1992 tax years, SGE 82-1, DGE 84-3, SGE 84-5, and TBS 89-1 did not acquire the benefits and burdens of ownership with respect to the breeding cattle they purportedly acquired from the Hoyt organization.  As a result, these partnerships never owned for tax purposes any breeding cattle to generate this income respondent determined they had for the years in issue.

---

[42]The sharecrop agreements provided that a partnership would still retain the breeding value certificates (i.e., essentially the rights to any registration papers) on calves produced by its breeding herd, even though, pursuant to the sharecrop agreement, all calves produced were to belong to the Hoyt organization entity that managed the partnership's breeding herd.

Accordingly, we hold that the 1988 through 1992 tax year capital gains and/or other farm income adjustments respondent determined against these foregoing partnerships cannot be sustained.

Issue 9.  Management's Deductions and Credits

In the FPAA's issued to Management for its 1987, 1988, 1989, and 1990 tax years, respondent disallowed various deductions and credits claimed by Management.

Among the adjustments in issue between the parties are tens of millions of dollars of other farm deductions attributable to large numbers of cattle Management purportedly had received from numerous cattle-breeding partnerships and then ostensibly transferred to Ranches in payment of feed, management, consulting, freight services, and other goods and services Ranches provided to Management.  As discussed supra in connection with Issue 1, the Court has determined certain specified cattle-breeding partnerships, during 1987 through 1990, did not acquire the benefits and burdens of ownership with respect to the breeding cattle they purportedly acquired from the Hoyt organization.  As they and other cattle-breeding partnerships the Hoyt organization formed and operated from 1987 through 1990, were never the owners for tax purposes of any breeding cattle, the Court concludes that Management "received" no cattle from these partnerships to "transfer" to Ranches in "payment" of these alleged goods and services Ranches provided to Management.

On brief, respondent has conceded that Management is entitled to certain deductions for the years in issue. The Court thus holds that Management is entitled to farming and other deductions in the amounts respondent conceded. The Court further holds that Management is not entitled to deductions for the years in issue in excess of the amounts respondent conceded. See Rules 142(a), 240(a).

On the record presented, petitioners have failed to establish that Management is entitled to fuel tax credits. Consequently, the Court sustains respondent's determinations in the FPAA's that Management is not entitled to fuel tax credits for some of the years in issue. See Rules 142(a), 240(a). Similarly, on the record presented, petitioners have failed to establish that Management is entitled to deduct research and development expenses under section 174. Among other things, the Court is not satisfied that expenditures were actually incurred in the amounts claimed for research or experimentation. See sec. 1.174-2(a)(1), Income Tax Regs. There is evidence of numerous irregularities in the Hoyt organization's "cattle records", including the fabrication of substantial amounts of fictitious cattle information. See supra note 22. Consequently, the Court sustains respondent's determinations in the FPAA's that Management is not entitled to deduct research and development expenses under section 174 for some of the years in issue. See

Rules 142(a), 240(a).

On brief, petitioners concede they have failed to produce any evidence regarding the section 179 expense that Management claimed for its 1989 tax year. Consequently, we sustain respondent's determination in the FPAA disallowing Management such expense for the 1989 tax year. See Rules 142(a), 240(a).

Issue 10. Management's Income

In the FPAA's issued to Management for its 1987, 1988, 1989, and 1990 tax years, respondent determined that Management (1) had (a) substantial management fees from its receipt of calves and culls from numerous cattle-breeding partnerships and (b) substantial sale income from its transfer of much of those same cattle to Ranches, (2) had unreported 1990 capital gains income from its sale of certain other assets, (3) received taxable distributions of assets from Ranches and Hoyt & Sons Ranch Properties, and (4) had income from the discharge of indebtedness.

As discussed supra in connection with Issues 1, 8, and 9, the Court has determined that cattle-breeding partnerships the Hoyt organization formed and operated from 1987 through 1992 did not acquire the benefits and burdens of ownership with respect to breeding cattle they purportedly acquired from the Hoyt organization and were not the owners for tax purposes of any breeding cattle. These partnerships thus did not have any cattle

to generate the management fees and sales income (from Management's then "transferring" to Ranches large numbers of animals "received" from the partnerships) respondent determined. Accordingly, we hold that the 1987, 1988, 1989, and 1990 farm income adjustments respondent determined against Management--to the extent of the management fee income and the sale income from Ranches--cannot be sustained. In all other respects, the Court sustains the 1987, 1988, 1989, and 1990 farm income adjustments respondent determined. See Rules 142(a), 240(a).

Petitioners offered no evidence concerning the 1990 section 1231 gain adjustment respondent determined against Management from its sale of certain other assets. Consequently, the Court sustains respondent's determination in the FPAA that Management had $720,526 of section 1231 gain for the 1990 tax year. See Rules 142(a), 240(a).

Petitioners offered no evidence concerning the 1988, 1989, and 1990 taxable distribution adjustments respondent determined Management had from its receipt of assets from Ranches and Hoyt & Sons Ranch Properties. On brief, respondent acknowledges that since it was unclear whether Management received $8,160,745 of the assets in 1989 or 1990, the same $8,160,745 amount was included in both 1989 and 1990. Respondent now states that he believes the $8,160,745 amount belongs in Management's income for 1990. Consequently, the Court sustains respondent's

determinations in the FPAA's that Management had $1,450,793 in taxable distributions for the 1988 tax year and $8,160,745 in taxable distributions for the 1990 tax year. See Rules 142(a), 240(a). The Court further holds that Management had $2,648,902 in taxable distributions (the $10,809,647 respondent originally determined, less the $8,160,745 respondent now states is properly allocable to 1990) for the 1989 tax year.

Petitioners offered no evidence concerning the 1989 and 1990 discharge of indebtedness adjustments respondent determined Management had from the forgiveness of amounts owed by it to Hoyt & Sons Ranch Properties on land leases from 1983 through 1989. On brief, respondent acknowledges that the same $4,984,403 amount was included in both 1989 and 1990. Respondent now states he believes this $4,984,403 of income should be recognized by Management for 1990. Consequently, the Court sustains respondent's determination in the FPAA that Management had $4,984,403 of discharge of indebtedness income for the 1990 tax year. See Rules 142(a), 240(a). The Court further holds that Management had no discharge of indebtedness income for the 1989 tax year.

To reflect the foregoing and the parties' concessions,

Decisions will be entered

under Rule 155.

APPENDIX A--FPAA Adjustments


DF #1

TYE          Adjustments

12-31-87     Total Adjustments to Ordinary Income

             Farm income                      $129,787
             Depreciation expense               23,826
             Interest expense                   13,285
             Other farm deductions             196,258
             Guaranteed payments                13,841

             Other Adjustments
             Self-employment income            118,165
             IRA contribution                    8,000

12-31-88     Total Adjustments to Ordinary Income

             Farm income                       121,264
             Interest expense                    7,038
             Other farm deductions             207,292
             Guaranteed payments                10,597

             Other Adjustments
             Self-employment income             28,265

9-30-89      Total Adjustments to Ordinary Income

             Interest expense                   12,888
             Other farm deductions             246,107
             Guaranteed payments                 4,906

             Other Adjustments
             Self-employment income             26,514

9-30-90      Total Adjustments to Ordinary Income

             Farm Income                       137,299
             Depreciation expense              280,175
             Interest expense                   82,496
             Other farm deductions              27,578
             Cattle losses--drought/disease    520,325
             Guaranteed payments                   280

Other Adjustments
  Self-employment income         $799,505
  Other deductions              137,299

9-30-91     Total Adjustments to Ordinary Income

  Depreciation expense        359,651
  Interest expense            123,750
  Sharecrop calves            325,360
  Cattle losses--drought/disease  440,850
  Guaranteed payments          3,254

Other Adjustments
  Self-employment income     1,007,487
  Other deductions             261,321

9-30-92     Total Adjustments to Ordinary Income

  Farm Income               109,981
  Depreciation expense        439,924
  Interest expense            131,737
  Calves--management fee     152,059
  Guaranteed payments          2,620

Other Adjustments
  Self-employment income       574,281


SGE 82-1

TYE       Adjustments

9-30-90     Total Adjustments to Ordinary Income

  Farm income            2,349,777
  Interest expense            91,326
  Other farm deductions      27,578
  Guaranteed payments           280

Other Adjustments
  Self-employment income          280
  Other deductions         1,151,341

9-30-91     Total Adjustments to Ordinary Income

  Farm income            150,392
  Depreciation expense        615,619
  Sharecrop calves            491,360

```
            Cattle losses--drought/disease $178,263
            Guaranteed payments                 4,919

         Other Adjustments
            Self-employment income          792,056
            Other deductions              1,117,006

9-30-92  Total Adjustments to Ordinary Income

            Farm income                      65,734
            Depreciation expense            262,938
            Interest expense                  4,000
            Calves-management fee           272,873
            Accounting fees                   3,086
            Guaranteed payments               3,386

         Other Adjustments
            Self-employment income          270,024
```

DGE 84-3

| TYE | Adjustments |
| --- | --- |

```
12-31-87  Total Adjustments to Ordinary Income

            Depreciation expense          1,078,475
            Interest expense                330,319
            Other farm deductions            92,163
            Guaranteed payments              17,082

         Other Adjustments
            Self-employment income        1,392,722
            IRA contribution                 32,000

12-31-88  Total Adjustments to Ordinary Income

            Depreciation expense          1,074,885
            Interest expense                179,318
            Other farm deductions           118,490
            Guaranteed payments              11,288

         Other Adjustments
            Self-employment income        1,243,908
            IRA contribution                 20,000
```

9-30-89    Total Adjustments to Ordinary Income

           Depreciation expense           $134,884
           Interest expense                113,757
           Other farm deductions           144,498
           Guaranteed payments               1,486

           Other Adjustments
           Self-employment income          244,581

9-30-90    Total Adjustments to Ordinary Income

           Farm income                   2,054,133
           Depreciation expense             67,940
           Interest expense                707,820
           Other farm deductions            27,578
           Cattle losses--drought/disease   19,500
           Guaranteed payments                 280

           Other Adjustments
           Self-employment income          794,812
           Other deductions                869,361

9-30-91    Total Adjustments to Ordinary Income

           Farm income                     148,621
           Depreciation expense            656,894
           Interest expense                230,000
           Sharecrop calves                401,720
           Cattle losses--drought/disease  367,633
           Guaranteed payments               4,017

           Other Adjustments
           Self-employment income        1,232,481
           Other deductions              1,058,365

9-30-92    Total Adjustments to Ordinary Income

           Farm income                     102,918
           Depreciation expense            411,672
           Interest expense                 42,750
           Calves--management fee          127,063
           Accounting fees                   3,086
           Guaranteed payments               2,300

           Other Adjustments
           Self-employment income          457,508

SGE 84-5

| TYE | Adjustments | |
|---|---|---|
| 12-31-87 | Total Adjustments to Ordinary Income | |
| | Depreciation expense | $1,090,460 |
| | Interest expense | 187,962 |
| | Other farm deductions | 92,163 |
| | Guaranteed payments | 15,062 |
| | Other Adjustments | |
| | Self-employment income | 1,264,350 |
| 12-31-88 | Total Adjustments to Ordinary Income | |
| | Depreciation expense | 893,334 |
| | Interest expense | 295 |
| | Other farm deductions | 119,820 |
| | Guaranteed payments | 15,328 |
| | Other Adjustments | |
| | Self-employment income | 880,664 |
| | IRA contribution | 28,000 |
| 9-30-89 | Total Adjustments to Ordinary Income | |
| | Depreciation expense | 448,101 |
| | Interest expense | 303,687 |
| | Other farm deductions | 141,166 |
| | Guaranteed payments | 1,486 |
| | Other Adjustments | |
| | Self-employment income | 744,396 |
| 9-30-90 | Total Adjustments to Ordinary Income | |
| | Farm income | 1,807,147 |
| | Depreciation expense | 138,075 |
| | Interest expense | 666,370 |
| | Other farm deductions | 27,578 |
| | Cattle losses--drought/disease | 152,425 |
| | Guaranteed payments | 280 |
| | Other Adjustments | |
| | Self-employment income | 956,422 |
| | Other deductions | 931,694 |

9-30-91     Total Adjustments to Ordinary Income

        Farm Income                    $150,276
        Depreciation expense        155,998
        Interest expense           209,500
        Sharecrop calves           401,720
        Guaranteed payments         4,018

        Other Adjustments
          Self-employment income     292,742
          Other deductions         381,176

9-30-92     Total Adjustments to Ordinary Income

        Farm income                  101,493
        Depreciation expense        405,972
        Interest expense            42,000
        Calves--management fee     324,948
        Accounting fees            3,086
        Guaranteed payments         3,806

        Other Adjustments
          Self-employment income     496,884


<u>DGE 86-2</u>

<u>TYE</u>         <u>Adjustments</u>

12-31-91    Total Adjustments to Ordinary Income

        Depreciation expense       862,447
        Sharecrop calves       2,479,421
        Cattle losses--drought/disease   976,369

        Other Adjustments
          Self-employment income   4,312,237


<u>TBS 89-1</u>

<u>TYE</u>         <u>Adjustments</u>

12-31-89    Total Adjustments to Ordinary Income

        Depreciation expense      1,056,720

        Other Adjustments

Self-employment income          $1,056,720

12-31-91   Total Adjustments to Ordinary Income
           Farm income                         11,686
           Depreciation expense               555,199
           Board expense                     1,983,470
           Cattle losses--drought/disease      237,325

           Other Adjustments
           Self employment income            2,750,837
           Other deductions                     14,578


TBS 90-1

TYE          Adjustments

12-31-92   Total Adjustments to Ordinary Income

           Depreciation expense              2,174,204
           Interest expense                    137,750
           Accounting fees                       3,086

           Other Adjustments
           Self-employment income            2,315,040


Management

TYE          Adjustments

9-30-87    Total Adjustments to Ordinary Income

           Gross receipts or sales              56,813
           Sales--livestock raised           2,803,274
           Management fees                  74,388,096
           Sales to Ranches                 36,201,929
           Reclassified section 1231 gain    1,159,679
           Other sales                       2,175,457
           Other income                            644
           Depreciation expense              1,006,785
           Interest expense                      3,618
           Other farm deductions             4,608,140

           Other Adjustments
           Self-employment income            6,018,585
           Fuel credit                          10,732
           Research credit                     185,640

|  |  |  |
|---|---|---|
|  | Investment credit | $2,189,204 |
| 9-30-88 | Total Adjustments to Ordinary Income | |
|  | Gross receipts or sales | 217,125 |
|  | Income--receipt of distrib.<br>ptrship. assets | 1,450,793 |
|  | Sales--livestock raised | 1,600,240 |
|  | Management fees | 54,610,680 |
|  | Sales to Ranches | 41,409,067 |
|  | Other sales | 7,339,811 |
|  | Other income | 99,660 |
|  | Depreciation expense | 141,467 |
|  | Interest expense | 14,770 |
|  | Other farm deductions | 5,924,524 |
|  | Other Adjustments | |
|  | Self-employment income | 5,574,221 |
|  | Fuel credit | 13,223 |
| 9-30-89 | Total Adjustments to Ordinary Income | |
|  | Gross receipts or sales | 99,751 |
|  | Income--discharge of indebtedness | 4,984,403 |
|  | Income--receipt of distrib.<br>ptrship. assets | 10,809,647 |
|  | Sales--livestock raised | 6,491,658 |
|  | Management fees | 35,889,200 |
|  | Sales to Ranches | 54,879,409 |
|  | Other sales | 12,131,943 |
|  | Depreciation expense | 141,858 |
|  | Interest expense | 369,617 |
|  | Other farm deductions | 7,058,246 |
|  | Other Adjustments | |
|  | Self-employment income | 16,580,142 |
|  | Fuel credit | 13,223 |
|  | Section 179 expense | 13,566 |
| 9-30-90 | Total Adjustments to Ordinary Income | |
|  | Income--receipt of distrib.<br>ptrship. assets | 8,160,745 |
|  | Basis livestock sold | 172,739 |
|  | Sales--livestock raised | 1,999,969 |
|  | Management fees | 46,762,200 |
|  | Sales to Ranches | 32,057,283 |
|  | Other sales | 1,441,785 |

| | |
|---|---:|
| Agriculture payments | 3,010 |
| Other income | $5,527,069 |
| Depreciation expense | 537,993 |
| Interest expense | 222,963 |
| Other farm deductions | 8,014,100 |
| General Partners' Office expenses | 620,731 |
| Laguna Tax Service expenses | 1,401,315 |
| Income--discharge of indebtedness | 4,984,403 |

Other Adjustments

| | |
|---|---:|
| Self-employment income | 15,016,325 |
| Rental income | 56,190 |
| Dividend income | 1,180 |
| Section 1231 gain | 720,026 |
| Fuel credit | 14,462 |
| Section 179 expense | 2,958,692 |

APPENDIX B--Adjustments in Issue

DF #1

| TYE | Adjustments | |
|---|---|---:|
| 12-31-87 | Interest expense | $9,054 |
| | Other farm deductions | 83,328 |
| | Guaranteed payments | 833 |
| | IRA contribution | 8,000 |
| 12-31-88 | Farm income/capital gain | 121,264 |
| | Interest expense | 7,038 |
| | Other farm deductions | 134,037 |
| | Guaranteed payments | 1,340 |
| 9-30-89 | Interest expense | 12,888 |
| | Other farm deductions | 386,937 |
| | Guaranteed payments | 3,869 |
| 9-30-90 | Farm income | 137,299 |
| | Depreciation expense | 280,175 |
| | Interest expense | 56,035 |
| | Other farm deductions | 386,937 |
| | Guaranteed payments | 3,869 |
| | Other deductions | 137,299 |
| 9-30-91 | Depreciation expense | 359,651 |
| | Interest expense | 125,879 |
| | Other farm deductions | 247,842 |
| | Guaranteed payments | 2,478 |
| 9-30-92 | Farm income/capital gain | 109,981 |
| | Depreciation expense | 439,924 |
| | Interest expense | 131,737 |
| | Other farm deductions | 283,248 |
| | Guaranteed payments | 2,620 |

SGE 82-1

| TYE | Adjustments | |
|---|---|---:|
| 9-30-90 | Farm income/capital gain | 2,349,777 |
| | Depreciation expense | 792,666 |
| | Interest expense | 103,962 |
| | Other farm deductions | 771,345 |

|  | Guaranteed payments | $9,463 |
|  | Other deductions | 1,551,341 |

| 9-30-91 | Farm income/capital gain | 150,392 |
|  | Depreciation expense | 792,666 |
|  | Interest expense | 20,071 |
|  | Other farm deductions | 491,360 |
|  | Guaranteed payments | 4,914 |

| 9-30-92 | Farm income/capital gain | 65,734 |
|  | Depreciation expense | 262,938 |
|  | Interest expense | 48,985 |
|  | Other farm deductions | 272,873 |
|  | Accounting fees | 3,086 |
|  | Guaranteed payments | 3,386 |

DGE 84-3

| TYE | Adjustments | |
|  |  |  |
| 12-31-87 | Depreciation expense | 432,900 |
|  | Interest expense | 151,515 |
|  | Other farm deductions | 598,176 |
|  | Guaranteed payments | 5,981 |
|  | Investment credit | 1,425,500 |

| 12-31-88 | Depreciation expense | 454,545 |
|  | Interest expense | 151,515 |
|  | Other farm deductions | 598,176 |
|  | Guaranteed payments | 8,022 |
|  | IRA contribution | 28,000 |

| 9-30-89 | Depreciation expense | 228,769 |
|  | Interest expense | 151,515 |
|  | Other farm deductions | 508,329 |
|  | Guaranteed payments | 5,159 |

| 9-30-90 | Farm income/capital gain | 2,054,133 |
|  | Depreciation expense | 398,000 |
|  | Interest expense | 355,000 |
|  | Other farm deductions | 422,343 |
|  | Guaranteed payments | 4,223 |

| 9-30-91 | Farm income/capital gain | 148,621 |
|  | Depreciation expense | 398,000 |
|  | Interest expense | 182,735 |
|  | Other farm deductions | 306,009 |

|  | Guaranteed payments | $8,022 |
|  | Other deductions | 1,058,365 |

| 9-30-92 | Farm income/capital gain | 102,918 |
|  | Depreciation expense | 158,625 |
|  | Interest expense | 130,525 |
|  | Other farm deductions | 306,009 |
|  | Accounting fees | 3,086 |
|  | Guaranteed payments | 3,060 |

SGE 84-5

| TYE | Adjustments | |
|  | | |

| 12-31-87 | Depreciation expense | 557,632 |
|  | Interest expense | 195,171 |
|  | Other farm deductions | 946,368 |
|  | Guaranteed payments | 9,463 |
|  | Investment credit | 2,060,100 |

| 12-31-88 | Depreciation expense | 585,514 |
|  | Interest expense | 195,171 |
|  | Other farm deductions | 804,222 |
|  | Guaranteed payments | 8,022 |
|  | IRA contribution | 28,000 |

| 9-30-89 | Depreciation expense | 324,476 |
|  | Interest expense | 195,171 |
|  | Other farm deductions | 515,916 |
|  | Guaranteed payments | 5,159 |

| 9-30-90 | Farm income/capital gain | 1,807,147 |
|  | Depreciation expense | 447,027 |
|  | Interest expense | 211,587 |
|  | Other farm deductions | 515,916 |
|  | Guaranteed payments | 5,159 |

| 9-30-91 | Farm income/capital gain | 150,276 |
|  | Depreciation expense | 470,657 |
|  | Interest expense | 211,587 |
|  | Other farm deductions | 452,961 |
|  | Guaranteed payments | 4,526 |

| 9-30-92 | Farm income/capital gain | 101,493 |
|  | Depreciation expense | 195,070 |
|  | Interest expense | 166,521 |
|  | Other farm deductions | 452,691 |

|                     |          |
|---------------------|----------|
| Accounting fees     | $4,526   |
| Guaranteed payments | 3,806    |

DGE 86-2

| TYE      | Adjustments           |           |
|----------|-----------------------|-----------|
| 12-31-91 | Depreciation expense  | 862,447   |
|          | Other farm deductions | 2,479,421 |

TBS 89-1

| TYE      | Adjustments              |           |
|----------|--------------------------|-----------|
| 12-31-89 | Depreciation expense     | 1,050,000 |
|          |                          |           |
| 12-31-91 | Farm income/capital gain | 11,686    |
|          | Depreciation expense     | 555,199   |
|          | Interest expense         | 194,320   |
|          | Other farm deductions    | 700,533   |
|          | Guaranteed payments      | 7,005     |

TBS 90-1

| TYE      | Adjustments           |         |
|----------|-----------------------|---------|
| 12-31-92 | Depreciation expense  | 736,707 |
|          | Interest expense      | 199,303 |
|          | Other farm deductions | 627,921 |
|          | Accounting fees       | 3,086   |
|          | Guaranteed payments   | 6,271   |

Management

| TYE     | Adjustments                 |             |
|---------|-----------------------------|-------------|
| 9-30-87 | Farm income[1]              | 114,755,879 |
|         | Depreciation expense        | 198,141     |
|         | Interest expense            | 3,618       |
|         | Other farm deductions[2]    | 40,810,069  |
|         | Fuel credit                 | 1,862       |
|         | Research credit             | 1,315,155   |

[1]Includes $74,388,096 of management fee income from

sharecrop agreements with cattle-breeding partnerships and $36,201,929 of sales income (see comment 2 below) from its transfer of animals to Ranches.

[2]Includes $36,201,929 payment made to Ranches to satisfy debt "over several years" for feed, management, consulting, freight services, etc.

| 9-30-88 | | |
|---|---|---|
| | Farm income[1] | $103,783,980 |
| | Income from receipt of distrib. ptrship. assets | 1,450,793 |
| | Depreciation expense | 25,196 |
| | Interest expense | 14,770 |
| | Other farm deductions[2] | 47,333,591 |
| | Fuel credit | 13,223 |
| | Research credit | 1,552,690 |

[1]Includes $54,610,680 of management fee income from sharecrop agreements with cattle-breeding partnerships and $41,409,067 of sales income (see comment 2 below) from its transfer of animals to Ranches.

[2]Includes $41,409,067 payment made to Ranches to satisfy debt "over several years" for feed, management, consulting, freight services, etc.

| 9-30-89 | | |
|---|---|---|
| | Farm income[1] | 102,989,553 |
| | Income from receipt of distrib. ptrship. assets | 10,809,647 |
| | Income from discharge of indebtedness | 4,984,403 |
| | Depreciation expense | 231,521 |
| | Interest expense | 369,617 |
| | Other farm deductions[2] | 61,937,655 |
| | Fuels credit | 14,178 |
| | Research credit | 762,645 |
| | Section 179 expense | 13,566 |

[1]Includes $35,889,200 of management fee income from sharecrop agreements with cattle-breeding partnerships and $54,879,409 of sales income (see comment 2 below) from transfer of animals to Ranches.

[2]Includes $54,879,409 payment made to Ranches to satisfy debt "over several years" for feed, management, consulting, freight services, etc.

| | | |
|---|---|---:|
| 9-30-90 | Farm income[1] | $71,585,386 |
| | Income from receipt of distrib. ptrship. assets | 8,160,745 |
| | Income from discharge of indebtedness | 4,984,403 |
| | Additional sec. 1231 gain | 720,526 |
| | Depreciation expense | 515,265 |
| | Interest expense | 222,963 |
| | Other farm deductions[2] | 40,161,738 |
| | Fuel credit | 14,462 |
| | Research credit | 1,828,968 |

[1]Includes $47,762,200 of management fee income from sharecrop agreements with cattle-breeding partnerships and $32,057,283 of sales income (see comment 2 below) from transfer of animals to Ranches.

[2]Includes $32,057,283 payment made to Ranches to satisfy debt "over several years" for feed, management, consulting, freight services, etc.